NO.  11-50107

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

____
____

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**DANIEL EDWARD CHOVAN,**

Defendant-Appellant.

____
____

Appeal from the United States District Court
for the Southern District of California
Honorable John A. Houston, District Judge Presiding

____
____

**APPELLANT'S OPENING BRIEF**

____
____

DEVIN BURSTEIN
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Basis for jurisdiction in the district court . . . . . . . . . . . . . . . . . . . . . 1

    B.   Basis for jurisdiction in the court of appeals . . . . . . . . . . . . . . . . . . 1

    C.   Bail status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ISSUES FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATUTORY AND REGULATORY PROVISIONS . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Mr. Chovan's sole, prior misdemeanor conviction and the restoration of his rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.   Mr. Chovan's record since his conviction . . . . . . . . . . . . . . . . . . . . . 4

    C.   Mr. Chovan's arrest and indictment . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.   Mr. Chovan's motion to dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E.   Mr. Chovan's plea and sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

i

A.  Section 922(g)(9) impermissibly restricts the individual, fundamental right to keep and bear arms and is thus unconstitutional in violation of the Second Amendment, both on its face and as applied to Mr. Chovan . . . . . . . . . . 12

  1.  Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

  2.  The Second Amendment, as interpreted in *Heller* and *McDonald*, is a personal and fundamental right . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

  3.  The Second Amendment applies to Mr. Chovan and section 922(g)(9) regulates conduct within its scope . . . . . . . . . . . . . . . . . . . . . . . . . 16

      a.  Under its plain text, and as historically understood, the Second Amendment applies to those with misdemeanor domestic violence convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      b.  *Vongxay* does not suggest that people with misdemeanor domestic violence convictions do not fall within the scope of the Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

  4.  Strict scrutiny is the appropriate standard, because section 922(g)(9) severely burdens a fundamental right . . . . . . . . . . . . . . . . . . . . . . . . 24

  5.  Section 922(g)(9) cannot satisfy strict scrutiny, because it is not narrowly tailored . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  6.  If the Court determines that strict scrutiny is not appropriate, it should evaluate section 922(g)(9) under intermediate scrutiny and hold it unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  7.  Even if Section 922(g)(9) can withstand a facial challenge, it cannot satisfy either strict or intermediate scrutiny, as applied to Mr. Chovan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

  8.  Section 921(a)(33)(B)(ii) cannot save section 922(g)(9) . . . . . . . . 41

9.     The government has not met its burden to establish section 922(g)(9)'s
validity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B.     Mr. Chovan was not amenable to prosecution under section 922(g)(9), because
his civil rights had been restored . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

ADDENDUM

PROOF OF SERVICE

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bullfrog Films, Inc. v. Wick*,
    847 F.2d 502 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Burdick v. Takushi*,
    504 U.S. 428 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Caron v. United States*,
    524 U.S. 308 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Central Hudson Gas & Electric Corp. v. Public Serv. Commission of N. Y.*,
    447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Courier-Journal v. Marshall*,
    828 F.2d 361 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Diouf v. Napolitano*,
    634 F.3d 1081 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*King v. Trujillo*,
    638 F.3d 726 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Logan v. United States*,
    552 U.S. 23 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 52

*Members of City Council of City of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    130 S. Ct. 1324 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*NAACP v. Alabama*,
    377 U.S. 288 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Nordyke v. King*,
    --- F.3d ---, Case No. 07-15763, 2011 U.S. App. LEXIS 8906 (9th Cir. May 2,
    2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 28, 29, 30, 31

*Planned Parenthood of SE. Pa. v. Casey*,
    505 U.S. 833 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Plyler v. Doe,*
  457 U.S. 202 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*R.G. Wegman Construction Co. v. Admiral Insurance Co.,*
  629 F.3d 724 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Roulette v. City of Seattle,*
  97 F.3d 300 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Sakamoto v. Duty Free Shoppers, Ltd.,*
  764 F.2d 1285 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Alvarez,*
  617 F.3d 1198 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33, 34

*United States v. Amezcua-Vasquez,*
  567 F.3d 1050 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Christian Echoes National Ministry, Inc.,*
  404 U.S. 561 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Emerson,*
  270 F.3d 203 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 35

*United States v. McCane,*
  573 F.3d 1037 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Valerio,*
  441 F.3d 837 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*United States v. Vongxay,*
  594 F.3d 1111 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 23

*United States v. Williams,*
  616 F.3d 685 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Younger,*
  398 F.3d 1179 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Webster v. Fall,*
  266 U.S. 507 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Zablocki v. Redhail,*
  434 U.S. 374 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

# UNITED STATES CONSTITUTION

Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

# FEDERAL STATUTES

18 U.S.C. § 704(b),(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34
18 U.S.C. § 921(a)(33) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
18 U.S.C. § 922(g)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
18 U.S.C. § 924(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6
18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
28 U.S.C. § 1292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1294(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

# STATE STATUTES

Cal Const. art. II § 4, art. VII § 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Cal. Penal Code § 273.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18, 19
Cal. Penal Code § 1203.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Cal. Penal Code § 1203.4a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Cal. Penal Code § 12021(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Cal. Code Civ. Pro. § 203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Kan. Stat. Ann. § 21-4615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Kan. Stat. Ann. § 22-3722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# FEDERAL RULES

9th Cir. R. 28-2.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Fed. R. App. P. 4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

# MISCELLANEOUS

*Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia
v. Heller and Judicial Ipse Dixit,* 60 Hastings L.J. 1371, 1376 (2009) . . . . . . . . 21

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing
Guidelines* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 38, 39

Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008) . . . . . . . . 20

*Timothy D. Lytton, Tort Claims Against Gun Manufacturers for Crime-Related Injuries: Defining a Suitable Role for the Tort System in Regulating the Firearms Industry,* 65 Mo. L. Rev. 1, 16-17 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

## UNITED STATES SENTENCING GUIDELINES

U.S.S.G. § 4A.1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32
U.S.S.G. § 4A1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | C.A. No. 11-50107 |
| ) | |
| ) | U.S.D.C. No. 10CR1805-JAH |
| Plaintiff-Appellee, ) | |
| ) | |
| ) | **APPELLANT'S OPENING** |
| v. ) | **BRIEF** |
| ) | |
| **DANIEL EDWARD CHOVAN,** ) | |
| ) | |
| ) | |
| Defendant-Appellant. ) | |
| _____ ) | |

## JURISDICTIONAL STATEMENT

Daniel Edward Chovan, Jr. appeals from his conviction and sentence in the Southern District of California for being a prohibited person in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2).

**A.    Basis for jurisdiction in the district court.**

The district court has original jurisdiction over criminal offenses against the United States.  18 U.S.C. § 3231.

**B.    Basis for jurisdiction in the court of appeals.**

This Court has jurisdiction over a timely appeal, Fed. R. App. P. 4(b), from a final order entered in the Southern District of California, within the Ninth Circuit's geographical jurisdiction.  28 U.S.C. §§ 1292 & 1294(1).  Sentence was imposed in

this case on March 21, 2011.  [CR 48].[1]  Mr. Chovan timely filed a Notice of Appeal

on March 22, 2011.  Fed. R. App. P. 4(b); [CR 49; ER 161].  The final judgment and

commitment order was filed on March 23, 2011. [CR 48, 50; ER 155]. Mr. Chovan

appeals from a criminal judgment, a final order appealable under 28 U.S.C. § 1291.

## C.    Bail status.

Mr. Chovan is currently serving a five-year term of probation.

### ISSUES FOR REVIEW

1.    The core of the Second Amendment is the individual right to keep and bear

arms in the home for self-defense.  Mr. Chovan was prohibited from exercising this

right, pursuant to 18 U.S.C. § 922(g)(9), based solely on the fact that he was convicted

of a misdemeanor crime of domestic violence fifteen years ago -- his only prior

conviction.  Does section 922(g)(9)'s unrestricted, lifetime ban on the possession of

firearms in the home for self-defense violate the fundamental right protected by the

Second Amendment, either on its face or as specifically applied to Mr. Chovan?

2.    Pursuant to 18 U.S.C. § 921(a)(33)(B)(ii), the definition of misdemeanor crime

of domestic violence excludes anyone who has had his or her civil rights restored by

the jurisdiction in which the person was convicted.  Such relief also prevents

---

[1] "CR" refers to the Clerk's Record, "ER" refers to Appellant's Excerpt of
Record, and "PSR" refers to presentence report, which, in accordance with Ninth
Circuit rules, will be filed under seal, along with this brief.

prosecution under section 922(g)(9).  Here, post-conviction, Mr. Chovan's right to bear arms -- the only civil right he lost -- was restored under California law.  Were Mr. Chovan's civil rights restored, such that he was not amenable to prosecution under section 922(g)(9)?

## STATUTORY AND REGULATORY PROVISIONS

Pursuant to 9th Cir. R. 28-2.7, copies of pertinent statutes and regulations appear in the attached addendum.

## STATEMENT OF THE CASE

On May 12, 2010, the government charged Mr. Chovan with being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(9) (possession of a firearm by someone who has been convicted of a misdemeanor crime of domestic violence).  [ER 4-6].  The charge was based on Mr. Chovan's 1996 California misdemeanor conviction for corporal injury to a spouse. [ER 4].  Mr. Chovan moved to dismiss the indictment, arguing that section 922(g)(9) was unconstitutional, in violation of the Second Amendment.  [ER 7].

The district court denied the motion.  [CR 29; ER 98].  Thereafter, Mr. Chovan entered into a conditional plea agreement, preserving his right to appeal the court's ruling.  He was subsequently sentenced to five years of probation.  [CR 50; ER 156].  Mr. Chovan now appeals the denial of his motion to dismiss and his conviction.

## STATEMENT OF FACTS

**A.    Mr. Chovan's sole, prior misdemeanor conviction and the restoration of his rights.**

In 1996, Mr. Chovan pleaded guilty to one count of misdemeanor injury to a spouse, in violation of California Penal Code § 273.5. [ER 2]. The conviction arose from a fight with his then-girlfriend, who later became his wife (and now his estranged wife). [ER 11]. He was sentenced to 120 days in custody and 3 years of probation. [ER 2]. This is Mr. Chovan's sole prior conviction. [ER 11].

As a result of the conviction, Mr. Chovan was prohibited under state law -- not federal law, at the time -- from possessing a firearm for 10 years. [ER 20, 46, 134]. This was the only civil right he lost. He remained qualified to vote, sit on a jury, etc. At the conclusion of the 10-year period, in 2006, Mr. Chovan regained his right to bear arms under California law. [ER 46].

**B.    Mr. Chovan's record since his conviction.**

Between 1996 and this case, Mr. Chovan has not been convicted of any crime. Nor has he been arrested. [PSR 4]. Other than a traffic violation, he has not had any significant contact with law enforcement. [PSR 4]. Instead, he has maintained steady employment as a welder, leading an average life. [PSR 7]. Although Mr. Chovan previously -- and lawfully -- associated with the National Socialist Movement (a white

4

nationalist group), there is nothing to suggest he ever engaged in violent acts with that group or any other.  [PSR 2; ER 128, 136-37].

## C.     Mr. Chovan's arrest and indictment.

The government began investigating Mr. Chovan after he applied to purchase a firearm in October, 2009 (filling out the proper application required by law).  [ER 26, 135].  A background check showed he was a prohibited purchaser, based on his old misdemeanor conviction, and Mr. Chovan was not allowed to buy the gun.  [ER 26].  Then, in March, 2010, San Diego County Sheriffs responded to a domestic-dispute call at Mr. Chovan's residence.  [PSR 1].

The call was made by Mr. Chovan's estranged wife, and accounts differ as to what took place.  [ER 128].  According to his estranged wife, Mr. Chovan was violent and threatened to harm her if she left him.  [PSR 1].  According to Mr. Chovan, he was neither violent nor threatening, and his estranged wife called the police because she was angry that he had left the marriage and started a new relationship with his current girlfriend.  [ER 128, 144-46].  Supporting Mr. Chovan's account of the events, no arrest was made and no charges were ever filed relating to this incident.  [PSR 1, ER 128, 144].

The officers responding to the call were told that Mr. Chovan had several guns in his home, and passed this information on to federal authorities, who then found video clips on the internet showing Mr. Chovan shooting a rifle for target practice in

5

front of his home in rural San Diego County.  [ER 26, 27].[2]  As a result, on April 15, 2010, federal agents executed a search warrant of Mr. Chovan's house and found four firearms: a Winchester shotgun, a .22 caliber rifle, a .22 caliber handgun, and a Baldwin & Company shotgun.  [PSR 1; ER 3].  Other than the handgun, all of the weapons belonged to Mr. Chovan's stepfather.  [PSR 2-3; ER 134].  His mother had asked Mr. Chovan to hold them at his house.  [PSR 5; ER 134-35].  One of these weapons, the Baldwin & Company shotgun, was an inoperable antique.  [PSR 3].

The day after the search, federal agents arrested Mr. Chovan without incident.  [ER 2].  He was charged in a two-count indictment with: (count 1) being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(9), and (count 2) making a false statement in acquisition of a firearm, in violation of 18 U.S.C. § 924(a).[3]  [ER 4-5].  As to count 1, the government charged him with possessing: (1) the Winchester shotgun, (2) the .22 caliber rifle, and (3) the .22 caliber handgun.  [ER 4-5].  Mr. Chovan moved to dismiss count 1 of the indictment.  [ER 7].

---

[2] The government has filed a copy of these videos at CR 38.  Should this Court want additional copies, Mr. Chovan will certainly make them available.

[3] Count 2 was subsequently dismissed on the government's motion and is not at issue in this appeal.  [CR 48].

6

**D.     Mr. Chovan's motion to dismiss.**

Mr. Chovan moved to dismiss the section 922(g)(9) charge on three grounds: (1) that it was unconstitutional in violation of his Second Amendment rights, (2) that he could not be prosecuted because his civil rights had been restored, and (3) that it was unconstitutional in violation of his right to equal protection.  [ER 8].

As to his Second Amendment claim, Mr. Chovan argued that he had an individual, fundamental right to keep and bear arms for self-defense and thus any infringement of that right must pass strict scrutiny.  [ER 15-19].  In addition to his Second Amendment challenge, Mr. Chovan explained that, pursuant to 18  U.S.C. § 921(a)(33)(B)(ii), a person who has had his or her civil rights restored by the relevant jurisdiction -- here California -- is not considered to have been convicted of a misdemeanor crime of domestic violence and cannot be prosecuted for violating section 922(g)(9).  [ER 19-20].  Because the only civil right he lost -- the right bear arms -- was restored under California law, Mr. Chovan argued that he was not subject to prosecution under section 922(g)(9).  [ER 19-20].  Finally, Mr. Chovan argued that the charge should be dismissed, because it violated his right to equal protection. [ER 20-24].

In response, the government argued that section 922(g)(9) is "a presumptively lawful regulation," exempt "from being an unlawful infringement on Second Amendment rights."  [ER 34].  According the government, section 922(g)(9) should

7

be treated just like the felon-in-possession statute, section 922(g)(1), and strict scrutiny should not apply.  [ER 34-38].  The government also argued that Mr. Chovan's civil rights had not been taken away and then restored in a manner that would prevent his prosecution under section 922(g)(9), and that the statute does not violate his right to equal protection.  [ER 38-41].

After the government filed its response, Mr. Chovan submitted a declaration, in which he swore that the firearms found at his house were "kept for the primary purpose of self-defense."  [ER 49].  He explained that "[t]he area surrounding my residence is rural," "[t]here are no routine police patrols," "[t]here have been several break-ins at properties in the area in the last few months," "[t]here is also a lot of wildlife in the area.  There are coyotes, mountain lions, and rattlesnakes."  [ER 49]. The government responded that the purpose for which Mr. Chovan kept the firearms was immaterial.  [ER 82].

After briefing, the district court held a hearing on the motion.  [ER 94].  The parties renewed their arguments, but the government added: "We believe intermediate scrutiny does apply and we'd like to go into further discussion of that in writing first before we argue that particular point.  I had anticipated that there would be additional briefing and that we would argue that point.  But for that reason, we believe intermediate scrutiny does, in fact, apply."  [ER 67].

8

Shortly after argument, the district court issued a written decision denying Mr. Chovan's motion. [ER 98]. The court found it "unnecessary to address Defendant's contention that a strict scrutiny analysis should apply" because "Defendant falls within an exemption from the Second Amendment right to bear arms, because section 922(g)(9) is longstanding and a presumptively lawful regulatory measure." [ER 99, n.1]. Without making any factual findings or undertaking an as-applied analysis of the statute, the district court concluded that "Congress' intent in passing section 922(g)(9) was to protect citizens from individuals like Defendant. Accordingly, Defendant's motion to dismiss is DENIED." [ER 103].

The district court also rejected Mr. Chovan's argument that he could not be prosecuted, because his civil rights had been restored. [ER 105]. The court concluded that "the Defendant only had his right to possess firearms restored which would be insufficient under the restoration of civil right analysis." [ER 105]. Finally, the district court considered Mr. Chovan's equal protection argument, holding that "Defendant's equal protection argument is without merit based upon the law of this Circuit." [ER 107].

**E.     Mr. Chovan's plea and sentencing.**

Mr. Chovan subsequently entered into a plea agreement with the government in which he agreed to plead guilty to count one of the indictment -- violating section 922(g)(9) -- but preserved his right to appeal the denial of his motion to dismiss. [ER

9

113-14, 123].  On November 9, 2010, Mr. Chovan entered a conditional guilty plea to count one of the indictment.  [CR 33].  He was sentenced to 5 years of probation. [ER 156].

### SUMMARY OF ARGUMENT

The Second Amendment to the United States Constitution codified a preexisting, fundamental, and personal right to keep and bear firearms.  The core of this guarantee is the right of the people to possess firearms, in their homes, for self-defense.  As that protected conduct is precisely the basis for Mr. Chovan's conviction, this prosecution represents an unconstitutional denial of his Second Amendment rights.

Mr. Chovan was convicted of violating 18 U.S.C. § 922(g)(9).  This regulation prohibits the possession of firearms by anyone who has been convicted of a misdemeanor crime of domestic violence.  It effects a complete ban that: (1) applies to all firearms, (2) draws no distinction between merely possessing a firearm in the home for protection and other uses, such as carrying a firearm in public, and (3) is lifelong, with no consideration of the prior conviction's age or the subsequent rehabilitation of the individual.

Section 922(g)(9), therefore, places a substantial burden on the Second Amendment rights of those within its purview, and the government must establish its validity under heightened judicial scrutiny.  Specifically, because there can be no

10

greater burden than section 922(g)(9)'s outright ban, strict scrutiny is appropriate. The government must demonstrate that the statute is narrowly tailored to a compelling governmental interest. This it cannot -- and did not -- do. Although the government has a compelling interest in preventing gun violence, section 922(g)(9) is not narrowly tailored to that interest. Its broad, lifetime prohibition is far greater than needed -- or warranted -- to serve the government's interest. Thus, section 922(g)(9) is unconstitutional.

This conclusion does not change if the Court applies intermediate scrutiny. Rather than being substantially related to societal safety, section 922(g)(9) is far overreaching. Given the statute's unlimited breadth, this Court can and should hold that section 922(g)(9) is, on its face, invalid in violation of the Second Amendment.

Even if the provision could survive a facial challenge, however, it cannot satisfy either strict or intermediate scrutiny, as applied in this case. Mr. Chovan was prosecuted and convicted on the sole basis of a fifteen-year-old misdemeanor conviction. He has no other criminal history nor any other reported arrests. Indeed, there is no proof he has ever again been violent. And he was prosecuted despite the restoration of his right to possess firearms under California law. In other words, on the record here, totally prohibiting Mr. Chovan from exercising his Second Amendment rights is not narrowly or substantially tailored to the government's interest. Thus, as applied to him, section 922(g)(9) is unconstitutional.

11

In the alternative, Mr. Chovan's conviction should also be vacated, because his civil rights were restored and thus, pursuant to section 921(a)(33)(B)(ii), he could not have been prosecuted under section 922(g)(9).

## **ARGUMENT**

### A.    Section 922(g)(9) impermissibly restricts the individual, fundamental right to keep and bear arms and is thus unconstitutional in violation of the Second Amendment, both on its face and as applied to Mr. Chovan.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." Section 922(g)(9) infringes on that right by banning all those convicted of a misdemeanor crime of domestic violence from ever possessing a firearm for any reason, including self-defense. Even if the conviction resulted from a minor tussle -- a mere push or shove where no injury occurred -- and decades have since passed without incident, the person is still prohibited from keeping a gun. *See* 18 U.S.C. § 922(g)(9).

This law exists and is enforced despite the Constitution's clear protection of the individual right to keep and bear arms. It exists with no temporal or geographic limitations. Indeed, because section 922(g)(9) is a sweeping, unlimited infringement on the rights guaranteed by the Second Amendment, it exists in violation of the Constitution and cannot stand.

12

1.    <u>Standard of review.</u>

This Court reviews de novo the constitutionality of a statute as well as constitutional challenges to the district court's denial of a motion to dismiss.  *See United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010).

2.    <u>The Second Amendment, as interpreted in *Heller* and *McDonald*, is a personal and fundamental right.</u>

In *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008), the Supreme Court considered whether the Second Amendment protects only the right to possess and carry a firearm in connection with militia service or an individual right to possess firearms unconnected with such service.  After substantial analysis, the Supreme Court determined that the Second Amendment "conferred an individual right to keep and bear arms."  *Id.* at 595.  This right was not granted by the Constitution, but was rather "a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'"  *Id.* at 592 (emphasis in original).

*Heller* clarified, however, that "the right was not unlimited, just as the First Amendment's right of free speech was not."  *Id.* at 595.  Turning to those limitations, the Supreme Court decided "not [to] undertake an exhaustive historical analysis [] of the full scope of the Second Amendment," but noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of

firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. These prohibitions were identified as "presumptively lawful regulatory measures," but the opinion did not expand on the nature of the presumption. *Id.* at 627 n.26.

The Supreme Court did, however, expand on the nature of the right to bear arms. It explained that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. The Supreme Court further explained that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Id.* at 636. Although the Supreme Court did not determine the appropriate level of scrutiny for evaluating Second Amendment restrictions, it rejected rational-basis review: "Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, *or the right to keep and bear arms*." *Id.* at 628 n.27 (emphasis added).

Following *Heller*, the Supreme Court decided *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). *McDonald* held that the Second Amendment is fully applicable to the States and confirmed that "[s]elf-defense is a basic right, recognized

14

by many legal systems from ancient times to the present day, and . . . that individual self-defense is 'the central component' of the Second Amendment right." *Id.* at 3036. The Supreme Court further determined "that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those *fundamental rights necessary to our system of ordered liberty*." *Id.* at 3032 (emphasis added).

Although *Heller* and *McDonald* answered several important questions regarding the Second Amendment, they expressly left many issues unresolved. As relevant here, neither case addressed the constitutionality of section 922(g)(9)'s lifetime prohibition on misdemeanants ever possessing a firearm in the home for self-defense. As the Seventh Circuit noted in *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), "[w]e do not think it profitable to parse these passages of *Heller* as if they contained an answer to the question whether § 922(g)(9) is valid . . . Instead of resolving questions such as the one we must confront, the Justices have told us that the matters have been left open." Thus, *Heller* should not be treated "as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open." *Id.*

15

The validity of section 922(g)(9) -- both on its face and certainly as applied to Mr. Chovan -- remains an open issue in this Circuit. Since *Heller*, this Court has not confronted the issue head on. Now, it should.

3.    The Second Amendment applies to Mr. Chovan and section 922(g)(9) regulates conduct within its scope.

Beginning from the Supreme Court's determination that the Second Amendment's core guarantee is the individual right to keep and bear arms in the home for self-defense, the initial question for this Court is whether section 922(g)(9) regulates conduct that falls within the scope of that right. That is, whether the Second Amendment gives some protection to Mr. Chovan's right to possess firearms in his home for the purpose of self-defense. As the Fourth Circuit framed the issue, "the first question is whether § 922(g)(9) burdens or regulates conduct that comes within the scope of the Second Amendment--i.e., whether the possession of a firearm in the home by a domestic violence misdemeanant is protected by the Second Amendment." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).[4] If the answer to this inquiry is yes -- which it is -- then section 922(g)(9) can be upheld only if the government can establish its constitutional validity. *See Chester*, 628 F.3d at 680

---

[4]*See also United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) ("First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.").

16

("unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law.").

>   a.      *Under its plain text, and as historically understood, the Second Amendment applies to those with misdemeanor domestic violence convictions.*

Looking to text of the Second Amendment, plainly there is no limitation on the right to keep and bear arms based on a person's criminal history. *See King v. Trujillo*, 638 F.3d 726, 729 (9th Cir. 2011) ("We begin, as always, with the statutory text."). Indeed, the literal language of the Second Amendment applies to Mr. Chovan -- and all others with misdemeanor domestic-violence crimes -- to the same extent it applies every other citizen.  Thus, under its plain text, the Second Amendment protects Mr. Chovan's right to keep firearms in his home.  Section 922(g)(9), therefore, must regulate conduct that comes within the Second Amendment's purview. *See Chester*, 628 F.3d at 680.

This conclusion is confirmed by the Amendment's historical context, which *Heller*'s analysis deemed highly relevant to understanding its scope. *See Heller*, 554 U.S. at 592.  Indeed, a review of the history of gun regulation in this country demonstrates that, when the Second Amendment was enacted, domestic-violence misdemeanants would not have been prohibited from owning a firearm.  As the Fourth Circuit put it: "we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence

17

misdemeanors." *Chester*, 628 F.3d at 681.  Thus, "[w]e must assume [] that [the defendant's] Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense."  *Id.* at 681-82.

This holding was based on the scholarly research of the issue.  *See id.*  For instance, former Deputy Assistant Attorney General C. Kevin Marshall's article *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009),  in which he detailed the relevant history of gun regulation.  Mr. Marshall explained that, on the federal level, a firearm disability based on criminal history had its roots in the Federal Firearms Act of 1938.  *See id.* at 698.  This Act contained a limited prohibition on those convicted of a "crime of violence," which was defined only as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," and certain forms of aggravated assault --"assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year."  *Id.* at 699.  Thus, simple misdemeanor assault -- such as prohibited by California Penal Code § 273.5(a), the statute under which Mr. Chovan was convicted -- would not have been a triggering crime of violence under the Federal Firearms Act.

That Act, in turn, was based on the Uniform Firearms Act, drafted in the 1920s by the National Conference of Commissioners on Uniform State Laws.  *See id.* at

18

700-01.  In 1926, the Uniform Firearms Act provided that a person convicted of a "crime of violence" could not "own or have in his possession or under his control, a pistol or revolver," defined as "any firearm with a barrel less than twelve inches in length." *Id.* at 701.  A "crime of violence," in turn, was defined as committing or attempting to commit "murder, manslaughter, rape, mayhem, assault to do great bodily harm, robbery, [larceny], burglary, and housebreaking." *Id.*  In focusing on crimes of violence, the drafting committee explained that the definition sought "to cover such crimes as are ordinarily committed with the aid of firearms." *Id.* at 701-02.  Thus, again, this statute did not apply to misdemeanor assault convictions and wholly exempted from any restriction the possession of firearms other than handguns.

Looking further back in United States history, "one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." *Id.* at 708.  Although different states enacted a variety of firearm regulations -- mostly limitations on carrying firearms -- there was no wholesale prohibition on those convicted of felonies, much less misdemeanors, possessing all types of firearms. *See id.* at 708-09.  Indeed, the notion that many "states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime [] is a considerable overstatement." *Skoien*, 615 F.3d at 648 (Sykes, C.J., dissenting) (citation omitted). To the contrary, "[o]nly four state constitutions had what might be considered Second Amendment analogues in 1791--Massachusetts,

19

North Carolina, Pennsylvania, and Vermont--and none of these provisions excluded persons convicted of a crime." *Id.* (citations omitted).    Thus, there is no precedent in United States history suggesting that the Second Amendment right to keep and bear firearms for the defense of home and family did not -- and does not -- apply to Mr. Chovan because of his conviction. *See id.* at 649 (citing Marshall, *Why Can't Martha Stewart Have a Gun?*; *United States v. McCane*, 573 F.3d 1037, 1047-50 (10th Cir. 2009) (Tymkovich, J., concurring), and Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008)).

Similarly, crossing the pond, early English common law also does not support a broad prohibition on those convicted of crimes possessing -- as opposed to carrying or using -- firearms. *See* Marshall, at 714-28.    Some confusion around this subject seems to have occurred as a result of the English rule that a convicted felon forfeited all of his or her goods, which would include firearms. *See id.* at 714-15.    It appears that several courts and commentators have pointed to this forfeiture law as support for a historical prohibition on convicts possessing firearms. *See id.*; *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001).    The forfeiture law, however, was the opposite of a general prohibition.    It provided for forfeiture at the time of conviction, but certainly did not prohibit the individual from reacquiring chattels, including firearms, when and if he or she was released from custody. *See* Marshall, at 715-16. Moreover, it simply did not apply to misdemeanants.

20

Indeed, as to specific firearm regulations, "English law in the 1700s depended on just one common-law rule for the regulation of arms: a prohibition against going about armed so as to terrify the people." *Id.* at 716. Further, although English history contains a number of firearm-related regulations -- such as laws limiting hunting rights or limiting gun possession of Catholics who would not swear an oath of loyalty to England -- there was no general prohibition on people with prior convictions possessing firearms for defense. *See id.* at 721-24. Rather, "[b]y the early 1700s, English subjects of all classes possessed a broad individual right to have arms." *Id.* at 719 (internal quotations omitted). Accordingly, there is no compelling historical justification for permanently depriving convicts of the basic right to possess firearms. *See id.*; *see also* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) (explaining that because state and federal "felon disarmament laws significantly postdate both the Second Amendment and the Fourteenth Amendment[,] [a]n originalist argument that sought to identify 1791 or 1868 analogues to felon disarmament laws would be quite difficult to make").

This is especially true when, as here, the prior conviction is a misdemeanor, not a felony. As discussed above, the initial firearm prohibitions did not apply to misdemeanants and the federal provision disarming domestic-violence misdemeanants was not enacted until 1996 (and did not even go into effect until after Mr. Chovan's

21

conviction).  *See Chester*, 628 F.3d at 681 (citing Pub. L. No. 104-208, § 658, 110 Stat. 3009, 3009-371 to -372 (1996)).  Thus, there is no basis to suggest that, as a matter of historical fact, Mr. Chovan would have been -- or should be -- excluded from the Second Amendment.  *Id.*  Accordingly, because section 922(g)(9) wholly prevents him, and all people with domestic-violence misdemeanor convictions, from exercising their Second-Amendment rights, the statute plainly regulates conduct that falls within the Amendment's scope.  The government, therefore, bears the burden of demonstrating its constitutional validity, which it cannot.

> b.   Vongxay *does not suggest that people with misdemeanor domestic violence convictions do not fall within the scope of the Second Amendment.*

This conclusion is not impacted or undercut by *United States v. Vongxay*, which addressed a very different question than raised here.  *See* 594 F.3d at 1114.  In *Vongxay*, the Court rejected a constitutional challenge to the felon-in-possession statute -- section 922(g)(1).  *See id.*  Focusing its analysis on *Heller*'s statement that it did not cast doubt on "longstanding prohibitions on the possession of firearms by felons," the Court explained that "*felons* are categorically different from the individuals who have a fundamental right to bear arms."  *Id.* at 1115 (emphasis added).

The Court also considered other, pre-*Heller*, Circuit precedent.  Specifically, "[i]n *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005), we held that

§ 922(g)(1) does not violate the Second Amendment rights of a convicted felon."
There, the Court "declined to make a distinction between violent and non-violent
felons and held that § 922(g)(1), which prohibits all felons from possessing firearms,
was constitutional." *Vongxay*, 594 F.3d at 1116. Although "[t]he reasoning upon
which *Younger* was based--that the Second Amendment does not give individuals a
right to bear arms--was invalidated by *Heller* . . . we are still bound by *Younger*." *Id.*
In other words, *Younger*'s holding that no distinction would be drawn between a
violent and non-violent felons for purposes of the firearm prohibition was still good
law. *See id.* Thus, the Court concluded that, based on *Heller* and *Younger*, regardless
of the nature of the felony conviction, the statute prohibiting felons from possessing
firearms -- § 922(g)(1) -- was constitutional.

Vongxay is not particularly relevant here, because the entirety of its analysis
centered on <u>felons</u>' rights (or lack thereof) under the Second Amendment. *See id.* at
1116-18 ("even given the Second Amendment's individual right to bear arms, felons'
Second Amendment rights can be reasonably restricted."). Indeed, the Court was
clear, "the Supreme Court has purposefully differentiated the right to bear arms
generally from the more limited right held by felons." *Id.* at 1118. Accordingly,
*Vongxay* is clearly about the "longstanding prohibitions on the possession of firearms
by *felons*," identified in *Heller*. *Id.* at 1115 (emphasis added). Just as clear is the fact
that *Vongxay* does not even purport to discuss or consider the prohibition on

misdemeanants possessing firearms. Indeed, it makes no mention of section 922(g)(9) and thus does not -- and cannot -- control the analysis here. *See Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985) ("unstated assumptions on non-litigated issues are not precedential holdings binding future decisions."); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

Accordingly, as demonstrated above, the Second Amendment -- both textually and as historically understood -- applies to people, like Mr. Chovan, who have been convicted of a misdemeanor crime of domestic violence. This Court, therefore, must determine whether section 922(g)(9)'s broad prohibition can withstand constitutional scrutiny.

4.    Strict scrutiny is the appropriate standard, because section 922(g)(9) severely burdens a fundamental right.

In making this determination, the first step is to decide what level of scrutiny to apply. *See Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 509 (9th Cir. 1988) ("Before we can determine whether the regulations are constitutional, we must first ascertain the appropriate level of scrutiny."). This Court, however, is not writing on a blank slate, as *Heller* has already taken rational basis review off of the table: "Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature

24

may regulate a specific, enumerated right, be it the freedom of speech . . . or the right to keep and bear arms." *Heller*, 554 U.S. at 628 n.27. In rejecting rational basis review, the Supreme Court stated that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.*

The question left open by *Heller* is thus what test should be used to evaluate infringements upon the specific, enumerated right to keep and bear arms? *See Nordyke v. King*, --- F.3d ---, Case No. 07-15763, 2011 U.S. App. LEXIS 8906, *11 (9th Cir. May 2, 2011) ("Because the Supreme Court has yet to articulate a standard of review in Second Amendment cases, that task falls to the courts of appeals and the district courts."). In *Nordyke*, this Court began the process of answering that question. Rejecting the notion that strict scrutiny should apply to every gun regulation, the Court held that "regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment." *Id.* at *22.

In determining whether a regulation imposes a substantial burden, the Court looked to analogous constitutional jurisprudence. *See id.* at *19. The regulation at issue in *Nordyke* prohibited gun shows on county-owned land. The Court thus looked to "whether the restriction leaves open sufficient alternative avenues for obtaining the good or service [i.e., guns]." *Id.* at *24. The Court explained, "when deciding

25

whether a restriction on gun sales substantially burdens Second Amendment rights, we should ask whether the restriction leaves law-abiding citizens with reasonable alternative means for obtaining firearms sufficient for self-defense purposes." *Id.* at *25.

The Court further determined that "a law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise." *Id.* at *26. It also explained that "a regulation is particularly unlikely to impose a substantial burden on a constitutional right where it simply declines to use government funds or property to facilitate the exercise of that right." *Id.* at *27. The Court concluded that the regulation at issue did not substantially burden the right to keep and bear arms, because it did not: (1) "make[] it materially more difficult to obtain firearms," (2) create "a shortage of places to purchase guns in or near Alameda County," and (3) "prohibit gun shows, but merely decline[d] to host them on government premises." *Id.* at *27-28.

For all the reasons that the regulation in *Nordyke* did not create a substantial burden, the prohibition in section 922(g)(9) does. Section 922(g)(9) is a complete ban -- in perpetuity, with no geographical limitations -- on the exercise of the right to keep and bear arms for home protection. It leaves no other alternatives open and applies to all categories of firearms. Indeed, it is the quintessential substantially burdensome regulation, because it is a total proscription on the exercise of a fundamental right.

26

This point is illustrated by comparing two Supreme Court cases that *Nordyke* referenced as informing the substantial burden analysis. *See id.* at *19. First, in *Planned Parenthood of SE. Pa. v. Casey*, 505 U.S. 833 (1992), the Supreme Court stated, "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. The Court further explained that "a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.* The Supreme Court held that the law before it was unconstitutional, because "[t]he spousal notification requirement . . . does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle." *Id.* at 893-94. In other words, "[i]t is an undue burden, and therefore invalid." *Id.* at 895.

On the other end of the spectrum is *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007) -- also cited in *Nordyke*. There, the Supreme Court upheld an abortion regulation as not imposing an undue burden on a woman's right to choose, because "the Act [at issue] allows, among other means, a commonly used and generally accepted method [for abortions], so it does not construct a substantial obstacle to the abortion right." *Id.*

27

From these contrasting cases, it is clear that a substantial burden is one that materially limits or interferes with the right at issue. Given that section 922(g)(9) makes it impossible to keep and bear firearms, it is clearly a substantial burden on the Second Amendment rights of those affected. Accordingly, under *Nordyke*, heightened scrutiny is required. Although *Nordyke* did not decide "precisely what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights," its analysis strongly suggests that strict scrutiny is appropriate. *Id.* at *22, n.9.

Most of the opinion addresses whether strict scrutiny need <u>always</u> apply, not whether it should ever apply. The only type of heightened scrutiny actually discussed in the opinion is strict scrutiny -- no other potential type of heightened scrutiny is even considered. Moreover, in reaching its holding on the application of heightened scrutiny, the Court specifically relied on three cases, all of which point to a strict scrutiny analysis: *Burdick v. Takushi*, 504 U.S. 428, 432 (1992); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451-52 (2008); and *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978). *See Nordyke*, at *21-22.

In *Burdick*, the Supreme Court rejected the idea that "a law that imposes *any* burden upon the right to vote must be subject to strict scrutiny." 504 U.S. at 432 (emphasis added). Rather, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at 434. Accordingly, "when those rights

28

are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* In other words, *Burdick* held that legislation substantially burdening voting rights would be subjected to strict scrutiny.

In *Wash. State Grange*, the Supreme Court made this point explicitly: "Election regulations that impose a *severe burden* on associational rights are subject to *strict scrutiny*, and we uphold them only if they are 'narrowly tailored to serve a compelling state interest.'" *Id.* at 451 (emphasis added). *Zablocki* echoes this point in the context of the right to marry: "Since our past decisions make clear that the right to marry is of fundamental importance, and since the classification at issue here significantly interferes with the exercise of that right, we believe that 'critical examination' of the state interests advanced in support of the classification is required." 434 U.S. at 383; *see also id.* at 388 ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.").

As these cases demonstrate, the greater the burden on a fundamental right, the higher -- more critical -- the level is scrutiny it must pass. Given that there can be no greater infringement of the right to keep and bear arms than section's 922(g)(9)'s total prohibition, the statute must be scrutinized strictly.

29

5.    <u>Section 922(g)(9) cannot satisfy strict scrutiny, because it is not narrowly tailored</u>.

To survive strict scrutiny, the government must demonstrate that the law is narrowly tailored to a compelling governmental interest. *See Nordyke*, at *15. Although section 922(g)(9) may reflect the government's compelling interest in preventing gun violence, it is unconstitutional, because it is not narrowly tailored to that interest. *See United States v. Alvarez*, 617 F.3d 1198, 1216 (9th Cir. 2010) (a law is not narrowly tailored when less restrictive means exist to achieve the interest). Specifically, it fails to account for: (1) the length of time a person has been a law-abiding, responsible citizen, and (2) the important distinction between keeping a firearm in the home for self-defense and other potential uses.  By way of example, a person who was convicted of a domestic violence misdemeanor at eighteen years old but reforms and is thereafter a law-abiding and responsible citizen for the next thirty years is nevertheless prohibited from possessing a firearm by section 922(g)(9).  The complete denial of the person's Second Amendment rights continues under section 922(g)(9), although it does not materially further the government's interest.

Indeed, the constitutional shortcomings of section 922(g)(9) are amply demonstrated by, among other things, its failure to account for the relevant data on recidivism.  This research shows that people with older convictions pose a far lesser risk of recidivating. *See Measuring Recidivism: The Criminal History Computation*

30

*of the Federal Sentencing Guidelines*, at 10-23.[5]  The United States Sentencing Commission has conducted in-depth studies of recidivism rates and concluded that a person's criminal history score under the Sentencing Guidelines is "the most predictive" measure of recidivism.  *Id.* at 10-11.  In particular, the best indicator of whether that person will recidivate is the number of criminal history points a person has at the time of sentencing.  *See id.*  at 16.  People with no criminal history points have, by far, the lowest rate of future recidivism.  *See id.* at 23.

The Commission has further determined that prior sentences imposed more than 10 or 15 years before a current conviction should not -- and do not --  result in the assignment of any criminal history points.  *See* U.S.S.G. §§ 4A.1.1 (introductory commentary),[6] 4A1.1, appl. n.1, 4A1.2(e); *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009) (explaining that "time limitations on qualifying predicate convictions" address "the risk of recidivism").  Thus, someone whose only prior criminal history consists of a 10-year-old misdemeanor conviction will likely have no criminal history points under the Sentencing Guidelines.  *See* U.S.S.G.

---

[5]Available  atwww.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_History.pdf

[6] The introductory commentary to the criminal history section of the guidelines states:  "The specific factors included in § 4A1.1 and § 4A1.3 are consistent with the extant *empirical research assessing correlates of recidivism and patterns of career criminal behavior*." (emphasis added).

§§ 4A.2.  This discounting of stale convictions reflects the reality that a decade-old crime -- with no intervening criminal history -- is simply not a meaningful indication that the person is likely to recidivate in the future.

Section 922(g)(9), however, makes no allowance for this statistical fact.  Rather than tailoring its prohibition by imposing a time limitation -- e.g., ten or fifteen years without a subsequent conviction --  it needlessly imposes a lifetime ban.  In addition, the regulation draws no distinction between keeping a firearm at home and carrying a weapon outside of one's property.  On its face, section 922(g)(9) applies without any consideration of the place in which, or purpose for which, a firearm is kept.

Although Mr. Chovan does not take issue with the government's right to limit the ability of violent criminals to possess dangerous weapons, section 922(g)(9) simply paints with too broad a brush.  As the Supreme Court has made clear, "a governmental purpose to control or prevent activities constitutionally subject to [] regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964)  Thus, "[t]he power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom.  '. . . Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly  achieved.'" *Id.* at 307-08 (ellipses in original, citations omitted).

Even criminal statutes serving "notable interest[s]" must be narrowly tailored when they regulate a fundamental right. *Alvarez*, 617 F.3d at 1216. Otherwise, they are unconstitutional. *See id.* In *Alvarez*, this Court considered the validity of the Stolen Valor Act, 18 U.S.C. § 704(b),(c), which criminalizes false claims about receiving military medals. Applying strict scrutiny, the Court held the Act unconstitutional in violation of the First Amendment. *See id.* at 1216-17. Although the Court agreed with the government that "honoring and motivating our troops are doubtless important governmental interests," it explained that "it is speculative at best to conclude that criminally-punishing lies about having received Congressionally-awarded medals is the *best and only way* to ensure the integrity of such medals." *Id.* at 1217 (emphasis added). Thus, the Court concluded that the "Act is not narrowly tailored" and therefore "facially invalid" *Id.* at 1217.

The same analysis should apply here. The government cannot demonstrate that section 922(g)(9)'s lifetime ban is the "best and only way" way to protect the public. The statute is simply too broad. *See id.* It contains no provision limiting its applicability when a total firearm prohibition is no longer necessary, such as when the person has been crime-free for a number of years and/or can satisfy an individualized

33

dangerousness review. *See id.* Thus, it is not narrowly tailored, and should be held unconstitutional under the Second Amendment.[7]

6.    If the Court determines that strict scrutiny is not appropriate, it should evaluate section 922(g)(9) under intermediate scrutiny and hold it unconstitutional.

Even if Mr. Chovan's prior conviction somehow diminished the level of Second Amendment protection to which he is entitled -- which it should not -- such that strict scrutiny is not required, section 922(g)(9) is nevertheless unconstitutional, because it cannot pass intermediate scrutiny. As noted, given that the statute places a substantial burden on the exercise of Second Amendment rights and that *Heller* has already rejected rational basis review, some form of heightened scrutiny is required.

Several Circuit courts have indicated that intermediate scrutiny is proper. *See Skoien,* 614 F.3d at 641 ("some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and [] § 922(g)(9) is valid only if substantially related to an important governmental objective."); *Chester*, 628 F.3d at 683 ("the government must demonstrate under the intermediate scrutiny standard that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective."); *also*

_____

[7] It should be noted that the district court's contrary conclusion on this point was a non sequitur. According to the district court section 922(g)(9) is constitutional, because "Congress' intent in passing section 922(g)(9) was to protect citizens from individuals like [Mr. Chovan]." [ER 102]. Of course, the issue is not whether it is within Congress' intent to prohibit Mr. Chovan from possessing a weapon. Rather, the question is, regardless of intent, whether the enacted legislation can pass constitutional scrutiny. As demonstrated above and below, it cannot.

*Marzzarella*, 614 F.3d at 97 (holding that 18 U.S.C. § 922(k) -- prohibiting possession of a firearm with an obliterated serial number -- should be analyzed under an "intermediate scrutiny" test); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny to an as-applied challenged to the felon-in-possession statute). Moreover, the government in this case has conceded that intermediate scrutiny applies to Mr. Chovan's claims. [ER 67]. Thus, although Mr. Chovan strongly believes strict scrutiny is the only constitutionally permissible review, it is clear that, at the very least, intermediate scrutiny should apply.

Under intermediate scrutiny, the government bears the burden of demonstrating, at least, "that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." *Chester*, 628 F.3d at 638. As a general matter, the government has a substantial interest in keeping firearms away from those most likely to misuse them. Section 922(g)(9), however, is not designed to fit that interest reasonably. Rather, it is far overreaching.

By way of analogy, a person walking in a rainstorm may be said to have a substantial interest in keeping dry. And thus, use of any size umbrella from small to extra-large, or a rain coat, poncho, or similar covering would all be reasonably connected to that interest. On the other hand, constructing a massive tarp to cover the person's entire route so that no rain could ever reach the ground would be going

35

overboard.  While achieving the objective, that method is not reasonable.  So too with section 922(g)(9).

A more concrete example is provided by *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557 (1980).  There, the Supreme Court considered whether an order from the New York State Public Service Commission completely banning promotional advertising by electrical utilities violated the First Amendments.  Applying intermediate scrutiny,[8] the Supreme Court first determined that New York had a "substantial" interest in promoting energy conservation.  *Id.* at 568. It further concluded that "the State's interest in [] conservation is directly advanced by the Commission order at issue here." *Id.* at 569.  Nevertheless, the Court held the order unconstitutional under the First Amendment.  *Id.* at 571-72.

Noting that "[t]he Commission's order reaches all promotional advertising, regardless of the impact of the touted service on overall energy use," the Supreme Court determined that "the energy conservation rationale, as important as it is, cannot justify suppressing information about electric devices or services that would cause no net increase in total energy use."  *Id.* at 570.  Accordingly, "to the extent that the Commission's order suppresses speech that in no way impairs the State's interest in

---

[8] In *Central Hudson*, the Supreme Court "held that restrictions on nonmisleading commercial speech regarding lawful activity must withstand intermediate scrutiny." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1339 (2010).

energy conservation, the Commission's order violates the First and Fourteenth Amendments and must be invalidated." *Id.*

Although *Central Hudson* may not be a perfect analytical match, it certainly contains important guidance. Protecting the public is a worthy goal, but to the extent section 922(g)(9) prohibits the fundamental right to keep and bear arms without actually advancing the government's goals, it violates the Second Amendment and must be invalidated. Section 922(g)(9) is flawed in this manner. For instance, it prevents a 60-year-old person from possessing a gun in his or her home on the sole basis of a 40-year-old misdemeanor conviction, when that person no longer poses a danger. As this is not a meaningful or reasonable way to further public safety,[9] section 922(g)(9) is unconstitutional under intermediate scrutiny.

7.  <u>Even if Section 922(g)(9) can withstand a facial challenge, it cannot satisfy either strict or intermediate scrutiny, as applied to Mr. Chovan.</u>

Even if the Court disagrees as to the facial validity of section 922(g)(9), the provision cannot survive strict or intermediate scrutiny, as applied to Mr. Chovan. A statute is unconstitutional "as applied," when "'by its own terms, [it] infringes

---

[9] To the contrary, there is significant research indicating that responsible gun ownership actually deters crime, and thus makes society safer. *See, e.g.* Timothy D. Lytton, *Tort Claims Against Gun Manufacturers for Crime-Related Injuries: Defining a Suitable Role for the Tort System in Regulating the Firearms Industry*, 65 Mo. L. Rev. 1, 16-17 (2000) ("The deterrent effects of widespread private gun ownership benefit not only gun owners but also the public at large.").

constitutional freedoms in the circumstances of [a] particular case.'" *United States v. Christian Echoes Nat'l Ministry, Inc.*, 404 U.S. 561, 565 (1972). Thus, unlike a facial challenge, an as-applied claim implicates the constitutionality of a statute only as it relates to the particular challenger. *See Members of City Council of City of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 802-03 (1984). The as-applied inquiry here, therefore, is whether section 922(g)(9) is constitutional as to Mr. Chovan -- i.e., whether the government currently has a compelling interest in prohibiting Mr. Chovan from possessing a firearm and, if so, whether section 922(g)(9) is narrowly (or at least substantially) tailored to that interest. As to both, the answer is no.

Mr. Chovan has but one prior conviction -- the 1996 domestic violence misdemeanor. That conviction resulted in a short period in jail (120 days) with a longer period of probation. The Sentencing Commission's research has demonstrated that "[r]ecidivism is comparatively low for the lowest sentences (less than six months or probation)." *Measuring Recidivism,* at 14. The Commission has also found that those with stable employment are less likely to recidivate, and Mr. Chovan held a steady job as a welder. *See id.* at 12; [PSR 7]. Moreover, at the time of sentencing in this case, he had no criminal history points, reflecting the Sentencing Commission's conclusion that his stale, prior conviction did not increase his future recidivism risk. [PSR 4].

38

Indeed, during the 15 years between his prior conviction and his current arrest, Mr. Chovan had no other arrests, and, other than a traffic citation, virtually no law enforcement contact. According to a recent study by the National Institute for Justice, people who remain offense free for as long as Mr. Chovan (and indeed for much short periods) pose a recidivism risk equal to that of general population. *See* A. Blumstein & K. Nakamura, *'Redemption' in an Era of Widespread Criminal Background Checks*, NIJ Journal, June 2009, at 10, *available at* www.ncjrs.gov/pdffiles1/nij/226870.pdf. In other words, given that Mr. Chovan has remained law abiding for a number of years, he was no more likely to commit another crime than the average person. *See id.* at 14-15. Thus, there was no reason to restrict his Second Amendment rights.

Beyond this statistical analysis, Mr. Chovan's actual conduct shows that he was and is not a danger to society. Other than the unsubstantiated allegations of Mr. Chovan's estranged wife, there is no evidence to suggest that, since 1996, Mr. Chovan has ever again been violent or engaged in dangerous criminal behavior. Unsubstantiated allegations, of course, are not proof of anything except that the allegations were made. *See R.G. Wegman Constr. Co. v. Admiral Ins. Co.*, 629 F.3d 724, 731 (7th Cir. 2011) ("Allegation is not proof."). Those allegations, moreover, never resulted in an arrest, much less a conviction. [PSR 1]. They were vehemently disputed by Mr. Chovan and highly dubious given that they were made in the context

39

of Mr. Chovan seeking to end his marriage, while he was living with another woman. [ER 128, 144-46]. Indeed, there is no reason that Mr. Chovan would threaten to harm his estranged wife if she ever left him, when he had already left her. [ER 144-46]. These bald allegations, therefore, cannot support a firearm ban as applied to Mr. Chovan.

In short, there is little risk in allowing Mr. Chovan to possess firearms at his home for the purpose of self defense. On this point, to some extent the proof is in the pudding. Based on the videos obtained during the investigation of this case, it is clear that Mr. Chovan was in possession of the firearms at issue here for some time prior to his arrest. There is no evidence, however, that he ever did anything improper with those guns or even took them off of his property. To the contrary, the videos show him and others engaging in normal target practice. [ER 27]. Thus, despite having firearms at his disposal, he did not use them to break the law or for any other improper purpose. Moreover, when Mr. Chovan attempted to purchase a weapon, he did so following the proper lawful procedure. He filled out an application, as required by law. [ER 26]. Surely, this is not the action of a criminal seeking to obtain a firearm unlawfully for some nefarious purpose.

The government may try to respond by claiming that Mr. Chovan is dangerous, because he was formerly associated with the National Socialist Movement (a white nationalist group). This is a troubling argument that should be rejected out of hand.

40

Associating with a white nationalist group might be distasteful, but it is wholly lawfully and quintessentially constitutional under the First Amendment. *See Courier-Journal v. Marshall*, 828 F.2d 361, 366 (6th Cir. 1987) (holding that members of the Ku Klux Klan are protected by the First Amendment right to association). To suggest that by exercising his First Amendment right of association, Mr. Chovan could somehow compromise his Second Amendment right to keep and bear arms is anathema. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 925 (1982) ("Neither [guilt by association nor guilt for association] is permissible under the First Amendment."). Moreover, given that there was no finding that Mr. Chovan's association with this group had anything whatsoever to do with firearms, it is wholly irrelevant.

Accordingly, when section 922(g)(9) is weighed against Mr. Chovan's fundamental Second Amendment right to keep and bear firearms for the protection of his home, the lifetime ban must yield. The government simply cannot demonstrate that a total prohibition on Mr. Chovan having a firearm is necessary or substantially related to a compelling or important government interest. Thus, as applied to Mr. Chovan, section 922(g)(9) is unconstitutional.

8.    Section 921(a)(33)(B)(ii) cannot save section 922(g)(9).

Given that section 922 (g)(9) fails under both strict and intermediate scrutiny, the government may attempt to obfuscate the proper analysis by arguing the statute

does not actually impose an outright ban -- and is thus constitutional -- because there are certain exceptions.  The theory would be that, under 18 U.S.C. § 921(a)(33)(B)(ii), "[a] person shall not be considered to have been convicted of [a misdemeanor crime of domestic violence] if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms."  Thus, because there is, in theory, a way around the lifetime ban -- pardon, expungement, or restoration of civil rights -- the government may claim that section 922(g)(9) is a valid regulation.

This argument should be rejected, because it turns the constitutional inquiry on its head and is simply wrong as a matter of fact.  Section 922(g)(9) makes it illegal for a whole class of people to exercise their Second Amendment rights.  Section 921(a)(33)(B)(ii) does not change that fact, nor does it affect the scope of the infringement.  Rather, as the provision expressly states, it simply limits the definition of "misdemeanor crime of domestic violence" and does not even mention section 922.  In other words, section 921(a)(33)(B)(ii) helps to define who has been convicted of a misdemeanor crime of domestic violence, and thus who falls within section 922(g)(9)'s prohibition.  But as to those people -- individuals who have an intact conviction and therefore continue to fall within section 922(g)(9)'s purview -- section

921(a)(33)(B)(ii) is wholly irrelevant for the purpose of the Second Amendment analysis.  For them, section 922(g)(9)'s ban remains permanent.

In addition, given that Mr. Chovan was prosecuted under section 922(g)(9) while his prior conviction was intact, his as-applied challenge must consider the constitutionality of the statute as it has been applied to him.  The question is whether it is constitutionally permissible to ban <u>him</u> -- as he is -- from possessing a firearm in his home. *See Roulette v. City of Seattle*, 97 F.3d 300, 312 (9th Cir. 1996) (explaining that "[i]n an as-applied challenge, there is a narrow focus" on the particular person challenging the statute and on "whether the statute is constitutional as applied to [him or] her.").  To that end, section 921(a)(33)(B)(ii) cannot change the analysis here, because neither pardon, expungement, nor restoration of civil rights were reasonably available to Mr. Chovan.

Beginning with restoration of civil rights, the government has already taken the position that this was impossible for Mr. Chovan.  According to the government, because the only right he lost was the right to bear arms for 10 years, "the only civil right of his that was restored was the ability to posses a firearm under California law alone . . . the restoration of this right alone by operation of law is insufficient to protect the defendant from prosecution for a violation of § 922(g)(9)."  [ER 40].

43

According to the government, therefore, Mr. Chovan's civil rights could not have been restored because they were never taken away.[10]

As to expungement, neither of the relevant provisions of the California Penal Code could have assisted Mr. Chovan. First, section 1203.4 provides that anyone who has successfully completed probation may move to withdraw his or her guilty plea and have the charges dismissed, but "[d]ismissal of an accusation or information pursuant to this section does not permit a person to own, possess, or have in his or her custody or control any firearm or prevent his or her conviction under Section 12021." CAL. PENAL CODE § 1203.4(a). Thus, because this provision "expressly provides that the person may not . . . possess . . . firearms" it would not have changed Mr. Chovan's status under section 922(g)(9). *See* 18 U.S.C. § 921(a)(33)(B)(ii).

Similarly, section 1203.4a(a), which allows certain misdemeanants to have their convictions expunged following completion of their sentences, could not have helped Mr. Chovan, because it only applies to a "defendant convicted of a misdemeanor and not granted probation." CAL. PENAL CODE § 1203.4a(a). As Mr. Chovan was given three years of probation as part of his sentence [PSR 4], this provision was plainly inapplicable to him. Accordingly, because Mr. Chovan could not have avoided

---

[10] As discussed in greater detail below, Mr. Chovan disagrees with the government on this point. If the Court also disagrees, Mr. Chovan's conviction should be reversed, because his civil rights were restored in 2006 and thus he was not amenable to prosecution under section 922(g)(9). *See* 18 U.S.C. § 921(a)(33)(B)(ii).

section 922(g)(9)'s lifetime ban by having his conviction expunged, that theoretical possibility for others, cannot render section 922(g)(9) constitutional as applied to him.

Finally, as to pardons, the very idea that a federal statute could be rendered constitutional based on the off-chance that a state executive decides to extend his or her grace to someone convicted of a domestic violence crime is absurd. As Judge Sykes noted in *Skoien*, "I doubt that governors--in Wisconsin or elsewhere--pardon domestic-violence misdemeanants with any regularity. So Skoien is right that the § 922(g)(9) ban is effectively permanent, at least as to him" 614 F.3d at 653. The same is true as to Mr. Chovan. As applied to him, therefore, section 922(g)(9) is unconstitutional.

9.    The government has not met its burden to establish section 922(g)(9)'s validity.

Assuming for the sake of argument that this Court disagrees with Mr. Chovan's analysis as to why section 922(g)(9) is unconstitutional, it should nevertheless reverse and remand in this case, because it is the government's burden to prove that the statute is constitutional. It has not done so.

On this point, *Chester* is instructive. There, the defendant was charged with violating section 922(g)(9) and moved to dismiss, arguing that the statute was unconstitutional. *See Chester*, 628 F.3d at 677. The district court denied the motion. Analogizing to the felon-in-possession statute, the district court concluded that section 922(g)(9) was also "a lawful exercise by the government of its regulatory authority

45

notwithstanding the *Second Amendment*." *Id.* (emphasis in original). The Fourth Circuit reversed, vacating the district court's order and remanding for further proceedings. *See id.* at 683. Specifically, the court held that the government had not met its burden in demonstrating that section 922(g)(9) was constitutionally valid under intermediate scrutiny and therefore remanded "to afford the government an opportunity to shoulder its burden and Chester an opportunity to respond." *Id.*

Although "[t]he government ha[d] offered numerous plausible reasons why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; [] it ha[d] not attempted to offer sufficient evidence to establish a substantial relationship between § 922(g)(9) and an important governmental goal." *Id.* Thus, because the government had not actually provided evidence that section 922(g)(9) was substantially related to achieving the government's goal, it could not satisfy its burden to demonstrate that section 922(g)(9) was constitutional.

The same is true in this case. The district court never put the government to its burden of demonstrating the constitutionality of the statute. Indeed, the district court here made the same error as the district court in *Chester*. It concluded that "section 922(g)(9) is a longstanding and a presumptively lawful regulatory scheme" and thus there was no need to determine the appropriate level of scrutiny. [ER 99, n.1].

46

Moreover, nowhere in the record does the government offer any evidence that section 922(g)(9) is substantially related to an important governmental objective.

It was not until the hearing on Mr. Chovan's motion to dismiss the indictment that the government even raised the prospect of intermediate scrutiny, stating "we believe that intermediate scrutiny does apply and we'd like to go into further discussion of that in writing first before we argue that particular point." [ER 67]. The government explained that it "had anticipated that there would be additional briefing and that we would argue that point." [ER 67]. As this briefing never occurred, the government has conceded that it did not offer any evidence to carry its burden of demonstrating the constitutionality of section 922(g)(9) under intermediate scrutiny.

For this reason alone, if for no other, the Court should vacate the order denying Mr. Chovan's motion to dismiss and remand so that the district court can reconsider the issue after putting the government to its burden. *See Chester*, 628 F.3d at 683 ("we think it best to remand this case to afford the government an opportunity to shoulder its burden and Chester an opportunity to respond. Both sides should have an opportunity to present their evidence and their arguments to the district court in the first instance.").[11]

---

[11] This argument applies equally whether the Court determines that strict or intermediate scrutiny is appropriate, as the government has not been put to its burden under either standard.

47

The government, however, may attempt to avoid this outcome by relying on *Skoien*, in which the Seventh Circuit upheld section 922(g)(9) under intermediate scrutiny. Any such reliance would be misplaced. First, *Skoien* discussed a considerable amount of data that it used to find a substantial relationship between section 922(g)(9) and the government's objective of "preventing armed mayhem."" 614 F.3d at 642. That evidence, however, is clearly not part of the record in this case.

In addition, as thoroughly explained by the *Skoien* dissent, the data on which the majority relied is highly suspect. For example, "[t]he court has misread the materials it cites for this conclusion [that domestic abusers often commit acts that would be charged as felonies if the victim were a stranger], which document the well-recognized difficulty of prosecuting domestic violence because of victim fear or noncooperation but do not establish that acts of domestic violence are 'often' chargeable as felonies but for the domestic dynamic." *Id.* at 652 (Sykes, C.J., dissenting). *Skoien* also does not account for the Sentencing Commission data discussed above.

More importantly, a close reading of *Skoien* reveals that is was decided on the narrow ground that "[a] person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present." *Id.* at 645. The court determined that "Skoien is poorly situated to contend that the statute creates a lifetime ban for someone who does not pose any risk of further offenses. First, Skoien

48

is himself a recidivist, having been convicted twice of domestic battery. The first victim (in 2003) was his wife; after that marriage ended, the second victim (in 2006) was his new fiancee." *Id.* Moreover, "Skoien was arrested for possessing multiple guns just one year after that second conviction--while he was still on probation." *Id.*

Thus, the court held that, because section 922(g)(9) was proper as to Skoien, he could not challenge the statute as facially overbroad. Indeed, the court expressly stated "[w]hether a misdemeanant who has been law abiding for an extended period must be allowed to carry guns again . . . is a question not presented today." *Id.* That question, however, is presented today, and, as discussed above, should be answered in the affirmative, at least as to Mr. Chovan.[12]

Accordingly, this Court should reverse Mr. Chovan's conviction, and remand with an order that the district court dismiss the indictment against him, or, at the very least, remand for the district court to put the government to its burden of establishing section 922(g)(9)'s constitutionality under strict (or intermediate) scrutiny.

---

[12] Indeed, unlike the defendant in *Skoien*, who had multiple convictions and was arrested while on probation, *see* 614 F.3d at 645, Mr. Chovan has only one misdemeanor conviction in his entire life and was not under any form of supervision when he was arrested in this case. And, unlike the defendant in *Chester*, who was arrested just three years after his domestic violence conviction, Mr. Chovan went a decade and a half between his misdemeanor conviction and his arrest for possessing firearms at his home.

**B.    Mr. Chovan was not amenable to prosecution under section 922(g)(9), because his civil rights had been restored**.

In the alternative, Mr. Chovan's conviction should be vacated and the matter remanded with an order to dismiss the indictment, because his civil rights have been restored.[13]  As noted, section 922(g)(9) does not apply to those individuals who have had their civil rights restored after an otherwise qualifying conviction.  *See* 18 U.S.C. 921(a)(33)(B)(ii).  A person's civil rights may be restored either by a certificate from the state or by the operation of law.  *See Caron v. United States*, 524 U.S. 308, 313 (1998).

In determining whether someone has had his or her civil rights restored within the meaning of section 921, this Court applies a 3-step process:

> 1. Use state law to determine whether the defendant has a 'conviction.' If not, the defendant is not guilty. If so, go to step 2.
>
> 2. Determine whether the conviction was expunged, set aside, the defendant was pardoned, or the defendant's civil rights were restored. If not, the conviction stands. If so, go to step 3.
>
> 3. Determine whether the pardon, expungement, or restoration of civil rights expressly provides that the defendant may not ship, transport, possess, or receive firearms. If so, the conviction stands. If not, the defendant is not guilty.

*Valerio*, 441 F.3d at 840.

---

[13]  This Court reviews "de novo a district court's order denying a motion to dismiss when the order turns entirely on interpretation of federal and state statutes." *United States v. Valerio*, 441 F.3d 837, 839 (9th Cir. 2006).

50

Here, Mr. Chovan clearly has a conviction. Thus, moving to step two, the question is whether his civil rights were restored -- they were. Upon his conviction in 1996, California law barred Mr. Chovan from possessing a firearm for 10 years. *See* CAL. PENAL CODE § 12021(c)(1); [ER 46]. By operation of law, Mr. Chovan regained his right to bear arms under California law in 2006. *See id.* This is crucial, as "no civil right could be more relevant to [ ] future dangerousness than the right to possess firearms." *Valerio*, 441 F.3d at 842. Moreover, at that point, his restoration of civil rights was complete, because Mr. Chovan had retained his right to vote, to hold public office, and to sit on a jury. *See* CAL CONST. ART. II § 4, ART. VII § 8; CAL. CODE CIV. PRO. § 203.

Thus, moving to step 3, Mr. Chovan's restoration of the right to bear arms obviously did not "expressly provide[] that the defendant may not ship, transport, possess, or receive firearms" and, therefore, under the *Valerio* test, he should not have been in prosecuted for violating section 922(g)(9). *Id.* at 840. Although *Valerio* also commented that the restoration of the right to bear arms alone was "not enough" to save the defendant from federal prosecution for being a felon in possession of a firearm, it was because "Valerio's right to serve on a jury and his right to hold public office have not been restored." *Id.* at 843. Given the continued loss of these two important civil rights, "he does not get past the second step of the analysis, restoration of civil rights." *Id.* That problem is certainly not present in this case. Mr. Chovan

51

has all the civil rights under California law that he had before his conviction. Accordingly, he cannot be guilty of violating section 922(g)(9).

The government may respond that, because many of his rights were never taken away, they could not be restored and thus Mr. Chovan does not qualify as having his civil rights restored. This argument fails, because its conclusion does not follow from its premise. While Mr. Chovan agrees that, unless first taken away, a right cannot be restored, *see Logan v. United States*, 552 U.S. 23, 31-32 (2007), that concept cannot help the government. The issue is not that Mr. Chovan retained certain rights, but rather that he had his fundamental right to bear arms taken away, *see McDonald*, 130 S. Ct. at 3032, and then restored. The statute itself does not distinguish between categories of fundamental civil rights -- such as the right to bear arms and the right to vote -- nor does it suggest that restoration of the right to bear arms is insufficient. Therefore, Mr. Chovan fits within the language of 18 U.S.C. 921(a)(33)(B)(ii): "the law of the applicable jurisdiction provides for the loss of civil rights under such an offense" and he is a person who "has had civil rights restored." Thus, his conviction should be vacated and the indictment dismissed.

As Mr. Chovan argued below, a contrary holding would create an equal protection problem, because section 922(g)(9) would prohibit him from possessing a firearm, while allowing firearm possession by thousands of people convicted in other jurisdictions of similar, or more serious, offenses. *See*, *e.g.* KAN. STAT. ANN. §§

21-4615, 22-3722.[14] People in other states who lose more civil rights upon conviction -- such as the right to vote, hold office, and sit on the jury -- but gain them back following completion of their sentences would be allowed to possess a firearm under Federal law, while Mr. Chovan would not.

When, as here, such disparate treatment impacts a fundamental constitutional right, it can only be justified under strict scrutiny. *See Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) (when classifications "impinge upon the exercise of a 'fundamental right . . . it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest."). As discussed, section 922(g)(9) cannot satisfy that standard. Moreover, under the doctrine of constitutional avoidance, this Court should not interpret federal statutes to create constitutional problems. *See Diouf v. Napolitano,* 634 F.3d 1081, 1086 n.7 (9th Cir. 2011) ("The canon of constitutional avoidance is a 'cardinal principle' of statutory interpretation. '[W]hen an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (citations omitted)). Accordingly, the Court should hold that Mr. Chovan's civil rights have been restored and reverse his conviction.

---

[14] A large number of other such state statutes can be found at ER 21-22.

## **CONCLUSION**

Section 922(g)(9) is unconstitutional both on its face and as applied to Mr. Chovan.  Thus, his conviction should be vacated and the case remanded with an order that the indictment against him be dismissed.  In the alternative, his conviction should be vacated, because he had his civil rights restored under California law, and thus was not amenable to prosecution under section 922(g)(9).

Respectfully submitted,

*s/ Devin Burstein*

DATED:    July 21, 2011    **DEVIN BURSTEIN**
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California  92101-5030

54

## CERTIFICATE OF RELATED CASES

Counsel for the Appellant is unaware of any related cases pending before this

Court, which should be considered in this appeal.


Respectfully submitted,


 _s/ Devin Burstein_

DATED:  July 21, 2011              DEVIN J. BURSTEIN
                                  Federal Defenders of San Diego, Inc.
                                  Attorneys for Defendant-Appellant

55

**CERTIFICATION OF COMPLIANCE PURSUANT TO FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NUMBER  11-50107**

I certify that:

 X  1.    Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached Opening Brief is

❑    Proportionately spaced, has a typeface of 14 points or more and contains  13,182  words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words),

     **or is**

❑    Monospaced, has 10.5 or fewer characters per inch and contains _____ words or _____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

____2.    The attached brief is not subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because

❑    This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages:

❑    This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

    ❑    Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

     **or is**

    ❑    Monospaced, has 10.5 or fewer characters per inch and contains _____ pages or _____ word or _____ lines of text.

____3.    *Briefs in Capital Cases*

❑    The brief is being filed  in a capital case pursuant to the type-volume set forth at Circuit Rule 32-4 **and is**

❑    Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 21,0000 words; reply briefs must not exceed 9,800 words)

     **or is**

❑    Monospaced, has 10.5 or fewer characters per inch and contains _____ words or _____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 75 pages or 1,950 lines of text;

_____ 4.   *Amicus Brief*

❑   Pursuant to Fed. R. App. P. 29(d) and 9th Cir. R. 32-1, the attached amicus brief is proportionately spaced, has a typeface of 14 points or more and contains 7000 words of less,

**or is**

❑   Monospaced, has 10.5 or fewer characters per inch and contains not mor than either 7000 words or 650 lines of text,

**or is**

❑   **Not** subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed. R. App. P. 32(a)(1)(5).


Dated: July 21, 2011                          *s/ Devin Burstein*
                                                        **DEVIN BURSTEIN**
                                                        Federal Defenders of San Diego, Inc.
                                                        Signature of filing party

57

# ADDENDUM

# TABLE OF CONTENTS

**Page**

**Federal Statutes**

18 U.S.C. § 921 (Addendum A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 922 (Addendum B)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**States Statutes**

Cal. Const. art. II § 4 (Addendum C)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Cal. Const. art. VII § 8 (Addendum D)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Cal. Penal Code § 273.5 (Addendum E)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Cal. Penal Code § 1203.4 (Addendum F)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Cal. Penal Code § 1203.4a (Addendum G)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Cal. Penal Code § 12021(Addendum H)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Cal. Code Civ. Pro. § 203 (Addendum I)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Kan. Stat. Ann. § 21-4615 (Addendum J)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Kan. Stat. Ann. § 22-3722 (Addendum K)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# ADDENDUM A

**Effective: January 5, 2006**

United States Code Annotated Currentness
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 44. Firearms (Refs & Annos)
            → **§ 921. Definitions**

**(a)** As used in this chapter--

**(1)** The term "person" and the term "whoever" include any individual, corporation, company, association, firm, partnership, society, or joint stock company.

**(2)** The term "interstate or foreign commerce" includes commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, but such term does not include commerce between places within the same State but through any place outside of that State. The term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone).

**(3)** The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

**(4)** The term "destructive device" means--

    **(A)** any explosive, incendiary, or poison gas--

        **(i)** bomb,

        **(ii)** grenade,

        **(iii)** rocket having a propellant charge of more than four ounces,

        **(iv)** missile having an explosive or incendiary charge of more than one-quarter ounce,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 11-50107    07/21/2011    ID: 7828535    DktEntry: 6    Page: 70 of 132

**(v)** mine, or

**(vi)** device similar to any of the devices described in the preceding clauses;

**(B)** any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

**(C)** any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10; or any other device which the Attorney General finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational or cultural purposes.

**(5)** The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

**(6)** The term "short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such a weapon as modified has an overall length of less than twenty-six inches.

**(7)** The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

**(8)** The term "short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches.

**(9)** The term "importer" means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term "licensed importer" means any such person licensed under the provisions of this chapter.

**(10)** The term "manufacturer" means any person engaged in the business of manufacturing firearms or ammuni-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2

tion for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter.

**(11)** The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

**(12)** The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the payment or repayment of money.

**(13)** The term "collector" means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define, and the term "licensed collector" means any such person licensed under the provisions of this chapter.

**(14)** The term "indictment" includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

**(15)** The term "fugitive from justice" means any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding.

**(16)** The term "antique firearm" means--

**(A)** any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; or

**(B)** any replica of any firearm described in subparagraph (A) if such replica--

**(i)** is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

**(ii)** uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or

**(C)** any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition. For purposes of this subparagraph, the term "antique firearm" shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 11-50107     07/21/2011     ID: 7828535     DktEntry: 6     Page: 72 of 132

**(17)(A)** The term "ammunition" means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm.

**(B)** The term "armor piercing ammunition" means--

**(i)** a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or

**(ii)** a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

**(C)** The term "armor piercing ammunition" does not include shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the Attorney General finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.

**(18)** The term "Attorney General" means the Attorney General of the United States" [FN1]

**(19)** The term "published ordinance" means a published law of any political subdivision of a State which the Attorney General determines to be relevant to the enforcement of this chapter and which is contained on a list compiled by the Attorney General, which list shall be published in the Federal Register, revised annually, and furnished to each licensee under this chapter.

**(20)** The term "crime punishable by imprisonment for a term exceeding one year" does not include--

**(A)** any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

**(B)** any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

**(21)** The term "engaged in the business" means--

**(A)** as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;

**(B)** as applied to a manufacturer of ammunition, a person who devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition manufactured;

**(C)** as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;

**(D)** as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms;

**(E)** as applied to an importer of firearms, a person who devotes time, attention, and labor to importing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms imported; and

**(F)** as applied to an importer of ammunition, a person who devotes time, attention, and labor to importing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition imported.

**(22)** The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided,* That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which--

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

5

Case: 11-50107       07/21/2011       ID: 7828535       DktEntry: 6       Page: 74 of 132

**(C)** is intended--

    **(i)** to intimidate or coerce a civilian population;

    **(ii)** to influence the policy of a government by intimidation or coercion; or

    **(iii)** to affect the conduct of a government by assassination or kidnapping.

**(23)** The term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act ( 26 U.S.C. 5845(b)).

**(24)** The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

**(25)** The term "school zone" means--

    **(A)** in, or on the grounds of, a public, parochial or private school; or

    **(B)** within a distance of 1,000 feet from the grounds of a public, parochial or private school.

**(26)** The term "school" means a school which provides elementary or secondary education, as determined under State law.

**(27)** The term "motor vehicle" has the meaning given such term in section 13102 of title 49, United States Code.

**(28)** The term "semiautomatic rifle" means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

**(29)** The term "handgun" means--

    **(A)** a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and

    **(B)** any combination of parts from which a firearm described in subparagraph (A) can be assembled.

**[(30), (31)** Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000]

**(32)** The term "intimate partner" means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has co-habited with the person.

**(33)(A)** Except as provided in subparagraph (C), [FN2] the term "misdemeanor crime of domestic violence" means an offense that--

> **(i)** is a misdemeanor under Federal, State, or Tribal [FN3] law; and

> **(ii)** has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim

**(B)(i)** A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless--

> **(I)** the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

> **(II)** in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

>> **(aa)** the case was tried by a jury, or

>> **(bb)** the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

**(ii)** A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

**(34)** The term "secure gun storage or safety device" means--

**(A)** a device that, when installed on a firearm, is designed to prevent the firearm from being operated without

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 11-50107    07/21/2011    ID: 7828535    DktEntry: 6    Page: 76 of 132

first deactivating the device;

**(B)** a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or

**(C)** a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means.

**(35)** The term "body armor" means any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment.

**(b)** For the purposes of this chapter, a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located.

CREDIT(S)

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 226, and amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1214; Pub.L. 93-639, § 102, Jan. 4, 1975, 88 Stat. 2217; Pub.L. 99-308, § 101, May 19, 1986, 100 Stat. 449; Pub.L. 99-360, § 1(b), July 8, 1986, 100 Stat. 766; Pub.L. 99-408, § 1, Aug. 28, 1986, 100 Stat. 920; Pub.L. 101-647, Title XVII, § 1702(b)(2), Title XXII, § 2204(a), Nov. 29, 1990, 104 Stat. 4845, 4857; Pub.L. 103-159, Title I, § 102(a)(2), Nov. 30, 1993, 107 Stat. 1539; Pub.L. 103-322, Title XI, §§ 110102(b), 110103(b), 110105(2), 110401(a), 110519, Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 1997, 1999, 2000, 2014, 2020, 2150; Pub.L. 104-88, Title III, § 303(1), Dec. 29, 1995, 109 Stat. 943; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title VI, § 658(a)], Sept. 30, 1996, 110 Stat. 3009-371; Pub.L. 105-277, Div. A, § 101(b) [Title I, § 119(a)], § 101(h) [Title I, § 115], Oct. 21, 1998, 112 Stat. 2681-69, 2681-490; Pub.L. 107-273, Div. C, Title I, § 11009(e)(1), Nov. 2, 2002, 116 Stat. 1821; Pub.L. 107-296, Title XI, § 1112(f)(1) to (3), (6), Nov. 25, 2002, 116 Stat. 2276; Pub.L. 109-162, Title IX, § 908(a), Jan. 5, 2006, 119 Stat. 3083.)

[FN1] So in original. Probably should be followed by a period.

[FN2] So in original. No subparagraph (C) was enacted in subsec. (a)(33).

[FN3] So in original. Probably should not be capitalized.

2002 Acts. Amendment to this section by Pub.L. 107-296 effective 60 days after Nov. 25, 2002, see Pub.L. 107-296, § 4, set out as a note under 6 U.S.C.A. § 101.

Current through P.L. 112-23 approved 6-29-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Case: 11-50107      07/21/2011      ID: 7828535      DktEntry: 6      Page: 77 of 132

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

9

# ADDENDUM B



**Effective:[See Notes]**

United States Code Annotated Currentness
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 44. Firearms (Refs & Annos)
            → **§ 922. Unlawful acts**

**(a)** It shall be unlawful--

  **(1)** for any person--

    **(A)** except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or

    **(B)** except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce;

  **(2)** for any importer, manufacturer, dealer, or collector licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, except that--

    **(A)** this paragraph and subsection (b)(3) shall not be held to preclude a licensed importer, licensed manufacturer, licensed dealer, or licensed collector from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received; and this paragraph shall not be held to preclude an individual from mailing a firearm owned in compliance with Federal, State, and local law to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector;

    **(B)** this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of this title, is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duty; and

    **(C)** nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 11-50107    07/21/2011    ID: 7828535    DktEntry: 6    Page: 80 of 132

Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were in fact a State of the United States;

**(3)** for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter;

**(4)** for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity;

**(5)** for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

**(6)** for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter;

**(7)** for any person to manufacture or import armor piercing ammunition, unless--

**(A)** the manufacture of such ammunition is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

11

**(B)** the manufacture of such ammunition is for the purpose of exportation; or

**(C)** the manufacture or importation of such ammunition is for the purpose of testing or experimentation and has been authorized by the Attorney General;

**(8)** for any manufacturer or importer to sell or deliver armor piercing ammunition, unless such sale or delivery--

**(A)** is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;

**(B)** is for the purpose of exportation; or

**(C)** is for the purpose of testing or experimentation and has been authorized by the Attorney General; [FN1]

**(9)** for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes.

**(b)** It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver--

**(1)** any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age;

**(2)** any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance;

**(3)** any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)** to any person any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity; and

**(5)** any firearm or armor-piercing ammunition to any person unless the licensee notes in his records, required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

Paragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, licensed dealers, and licensed collectors. Paragraph (4) of this subsection shall not apply to a sale or delivery to any research organization designated by the Attorney General.

**(c)** In any case not otherwise prohibited by this chapter, a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if--

**(1)** the transferee submits to the transferor a sworn statement in the following form:

"Subject to penalties provided by law, I swear that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age, or that, in the case of a shotgun or a rifle, I am eighteen years or more of age; that I am not prohibited by the provisions of chapter 44 of title 18, United States Code, from receiving a firearm in interstate or foreign commerce; and that my receipt of this firearm will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside. Further, the true title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered are

Signature ........ Date ........"

and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance;

**(2)** the transferor has, prior to the shipment or delivery of the firearm, forwarded by registered or certified mail (return receipt requested) a copy of the sworn statement, together with a description of the firearm, in a form prescribed by the Attorney General, to the chief law enforcement officer of the transferee's place of residence, and has received a return receipt evidencing delivery of the statement or has had the statement returned due to the refusal of the named addressee to accept such letter in accordance with United States Post Office Department regulations; and

**(3)** the transferor has delayed shipment or delivery for a period of at least seven days following receipt of the notification of the acceptance or refusal of delivery of the statement.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13

A copy of the sworn statement and a copy of the notification to the local law enforcement officer, together with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 923(g).

**(d)** It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person--

**(1)** is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

**(2)** is a fugitive from justice;

**(3)** is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

**(4)** has been adjudicated as a mental defective or has been committed to any mental institution;

**(5)** who, being an alien--

  **(A)** is illegally or unlawfully in the United States; or

  **(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(6)** who [FN2] has been discharged from the Armed Forces under dishonorable conditions;

**(7)** who, having been a citizen of the United States, has renounced his citizenship;

**(8)** is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that--

  **(A)** was issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate; and

  **(B)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 11-50107    07/21/2011    ID: 7828535    DktEntry: 6    Page: 84 of 132

partner or child; or

**(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

**(9)** has been convicted in any court of a misdemeanor crime of domestic violence.

This subsection shall not apply with respect to the sale or disposition of a firearm or ammunition to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector who pursuant to subsection (b) of section 925 of this chapter is not precluded from dealing in firearms or ammunition, or to a person who has been granted relief from disabilities pursuant to subsection (c) of section 925 of this chapter.

**(e)** It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; except that any passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such common or contract carrier for the duration of the trip without violating any of the provisions of this chapter. No common or contract carrier shall require or cause any label, tag, or other written notice to be placed on the outside of any package, luggage, or other container that such package, luggage, or other container contains a firearm.

**(f)(1)** It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm or ammunition with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

**(2)** It shall be unlawful for any common or contract carrier to deliver in interstate or foreign commerce any firearm without obtaining written acknowledgement of receipt from the recipient of the package or other container in which there is a firearm.

**(g)** It shall be unlawful for any person--

**(1)** who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

**(2)** who is a fugitive from justice;

**(3)** who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

15

Case: 11-50107     07/21/2011     ID: 7828535     DktEntry: 6     Page: 85 of 132

trolled Substances Act (21 U.S.C. 802));

**(4)** who has been adjudicated as a mental defective or who has been committed to a mental institution;

**(5)** who, being an alien--

    **(A)** is illegally or unlawfully in the United States; or

    **(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(6)** who has been discharged from the Armed Forces under dishonorable conditions;

**(7)** who, having been a citizen of the United States, has renounced his citizenship;

**(8)** who is subject to a court order that--

    **(A)** was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

    **(B)** restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

    **(C)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

    **(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

**(9)** who has been convicted in any court of a misdemeanor crime of domestic violence,

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(h)** It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

16

person described in any paragraph of subsection (g) of this section, in the course of such employment--

**(1)** to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or

**(2)** to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(i)** It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

**(j)** It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

**(k)** It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

**(l)** Except as provided in section 925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

**(m)** It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

**(n)** It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(o)(1)** Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

**(2)** This subsection does not apply with respect to--

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

17

Case: 11-50107     07/21/2011     ID: 7828535     DktEntry: 6     Page: 87 of 132

**(A)** a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

**(B)** any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

**(p)(1)** It shall be unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm--

**(A)** that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or

**(B)** any major component of which, when subjected to inspection by the types of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

**(2)** For purposes of this subsection--

**(A)** the term "firearm" does not include the frame or receiver of any such weapon;

**(B)** the term "major component" means, with respect to a firearm, the barrel, the slide or cylinder, or the frame or receiver of the firearm; and

**(C)** the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is--

**(i)** constructed of, during the 12-month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17-4 PH stainless steel in a shape resembling a handgun; and

**(ii)** suitable for testing and calibrating metal detectors:

*Provided, however,* That at the close of such 12-month period, and at appropriate times thereafter the Attorney General shall promulgate regulations to permit the manufacture, importation, sale, shipment, delivery, possession, transfer, or receipt of firearms previously prohibited under this subparagraph that are as detectable as a "Security Exemplar" which contains 3.7 ounces of material type 17-4 PH stainless steel, in a shape resembling a handgun, or such lesser amount as is detectable in view of advances in state-of-the-art developments in weapons detection technology.

**(3)** Under such rules and regulations as the Attorney General shall prescribe, this subsection shall not apply to

the manufacture, possession, transfer, receipt, shipment, or delivery of a firearm by a licensed manufacturer or any person acting pursuant to a contract with a licensed manufacturer, for the purpose of examining and testing such firearm to determine whether paragraph (1) applies to such firearm. The Attorney General shall ensure that rules and regulations adopted pursuant to this paragraph do not impair the manufacture of prototype firearms or the development of new technology.

**(4)** The Attorney General shall permit the conditional importation of a firearm by a licensed importer or licensed manufacturer, for examination and testing to determine whether or not the unconditional importation of such firearm would violate this subsection.

**(5)** This subsection shall not apply to any firearm which--

**(A)** has been certified by the Secretary of Defense or the Director of Central Intelligence, after consultation with the Attorney General and the Administrator of the Federal Aviation Administration, as necessary for military or intelligence applications; and

**(B)** is manufactured for and sold exclusively to military or intelligence agencies of the United States.

**(6)** This subsection shall not apply with respect to any firearm manufactured in, imported into, or possessed in the United States before the date of the enactment of the Undetectable Firearms Act of 1988.

**(q)(1)** The Congress finds and declares that--

**(A)** crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;

**(B)** crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;

**(C)** firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Committee on the Judiciary the [FN3] House of Representatives and the Committee on the Judiciary of the Senate;

**(D)** in fact, even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce;

**(E)** while criminals freely move from State to State, ordinary citizens and foreign visitors may fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason;

**(F)** the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

19

Case: 11-50107    07/21/2011    ID: 7828535    DktEntry: 6    Page: 89 of 132

country;

**(G)** this decline in the quality of education has an adverse impact on interstate commerce and the foreign commerce of the United States;

**(H)** States, localities, and school systems find it almost impossible to handle gun-related crime by themselves--even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and

**(I)** the Congress has the power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection.

**(2)(A)** It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

**(B)** Subparagraph (A) does not apply to the possession of a firearm--

**(i)** on private property not part of school grounds;

**(ii)** if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

**(iii)** that is--

**(I)** not loaded; and

**(II)** in a locked container, or a locked firearms rack that is on a motor vehicle;

**(iv)** by an individual for use in a program approved by a school in the school zone;

**(v)** by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

**(vi)** by a law enforcement officer acting in his or her official capacity; or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

20

**(vii)** that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

**(3)(A)** Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the person knows is a school zone.

**(B)** Subparagraph (A) does not apply to the discharge of a firearm--

**(i)** on private property not part of school grounds;

**(ii)** as part of a program approved by a school in the school zone, by an individual who is participating in the program;

**(iii)** by an individual in accordance with a contract entered into between a school in a school zone and the individual or an employer of the individual; or

**(iv)** by a law enforcement officer acting in his or her official capacity.

**(4)** Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun free school zones as provided in this subsection.

**(r)** It shall be unlawful for any person to assemble from imported parts any semiautomatic rifle or any shotgun which is identical to any rifle or shotgun prohibited from importation under section 925(d)(3) of this chapter as not being particularly suitable for or readily adaptable to sporting purposes except that this subsection shall not apply to--

**(1)** the assembly of any such rifle or shotgun for sale or distribution by a licensed manufacturer to the United States or any department or agency thereof or to any State or any department, agency, or political subdivision thereof; or

**(2)** the assembly of any such rifle or shotgun for the purposes of testing or experimentation authorized by the Attorney General.

**(s)(1)** Beginning on the date that is 90 days after the date of enactment of this subsection and ending on the day before the date that is 60 months after such date of enactment, it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer a handgun (other than the return of a handgun to the person from whom it was received) to an individual who is not licensed under section 923, unless--

Case: 11-50107    07/21/2011    ID: 7828535    DktEntry: 6    Page: 91 of 132

**(A)** after the most recent proposal of such transfer by the transferee--

**(i)** the transferor has--

**(I)** received from the transferee a statement of the transferee containing the information described in paragraph (3);

**(II)** verified the identity of the transferee by examining the identification document presented;

**(III)** within 1 day after the transferee furnishes the statement, provided notice of the contents of the statement to the chief law enforcement officer of the place of residence of the transferee; and

**(IV)** within 1 day after the transferee furnishes the statement, transmitted a copy of the statement to the chief law enforcement officer of the place of residence of the transferee; and

**(ii)(I)** 5 business days (meaning days on which State offices are open) have elapsed from the date the transferor furnished notice of the contents of the statement to the chief law enforcement officer, during which period the transferor has not received information from the chief law enforcement officer that receipt or possession of the handgun by the transferee would be in violation of Federal, State, or local law; or

**(II)** the transferor has received notice from the chief law enforcement officer that the officer has no information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law;

**(B)** the transferee has presented to the transferor a written statement, issued by the chief law enforcement officer of the place of residence of the transferee during the 10-day period ending on the date of the most recent proposal of such transfer by the transferee, stating that the transferee requires access to a handgun because of a threat to the life of the transferee or of any member of the household of the transferee;

**(C)(i)** the transferee has presented to the transferor a permit that--

**(I)** allows the transferee to possess or acquire a handgun; and

**(II)** was issued not more than 5 years earlier by the State in which the transfer is to take place; and

**(ii)** the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of the law;

**(D)** the law of the State requires that, before any licensed importer, licensed manufacturer, or licensed dealer completes the transfer of a handgun to an individual who is not licensed under section 923, an authorized government official verify that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of law;

**(E)** the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

**(F)** on application of the transferor, the Attorney General has certified that compliance with subparagraph (A)(i)(III) is impracticable because--

    **(i)** the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

    **(ii)** the business premises of the transferor at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer; and

    **(iii)** there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

**(2)** A chief law enforcement officer to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(III) shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General.

**(3)** The statement referred to in paragraph (1)(A)(i)(I) shall contain only--

**(A)** the name, address, and date of birth appearing on a valid identification document (as defined in section 1028(d)(1)) of the transferee containing a photograph of the transferee and a description of the identification used;

**(B)** a statement that the transferee--

    **(i)** is not under indictment for, and has not been convicted in any court of, a crime punishable by imprisonment for a term exceeding 1 year, and has not been convicted in any court of a misdemeanor crime of domestic violence;

    **(ii)** is not a fugitive from justice;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(iii)** is not an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act);

**(iv)** has not been adjudicated as a mental defective or been committed to a mental institution;

**(v)** is not an alien who--

    **(I)** is illegally or unlawfully in the United States; or

    **(II)** subject to subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(vi)** has not been discharged from the Armed Forces under dishonorable conditions; and

**(vii)** is not a person who, having been a citizen of the United States, has renounced such citizenship;

**(C)** the date the statement is made; and

**(D)** notice that the transferee intends to obtain a handgun from the transferor.

**(4)** Any transferor of a handgun who, after such transfer, receives a report from a chief law enforcement officer containing information that receipt or possession of the handgun by the transferee violates Federal, State, or local law shall, within 1 business day after receipt of such request, communicate any information related to the transfer that the transferor has about the transfer and the transferee to--

    **(A)** the chief law enforcement officer of the place of business of the transferor; and

    **(B)** the chief law enforcement officer of the place of residence of the transferee.

**(5)** Any transferor who receives information, not otherwise available to the public, in a report under this subsection shall not disclose such information except to the transferee, to law enforcement authorities, or pursuant to the direction of a court of law.

**(6)(A)** Any transferor who sells, delivers, or otherwise transfers a handgun to a transferee shall retain the copy of the statement of the transferee with respect to the handgun transaction, and shall retain evidence that the transferor has complied with subclauses (III) and (IV) of paragraph (1)(A)(i) with respect to the statement.

**(B)** Unless the chief law enforcement officer to whom a statement is transmitted under paragraph (1)(A)(i)(IV)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

24

Case: 11-50107      07/21/2011      ID: 7828535      DktEntry: 6      Page: 94 of 132

determines that a transaction would violate Federal, State, or local law--

**(i)** the officer shall, within 20 business days after the date the transferee made the statement on the basis of which the notice was provided, destroy the statement, any record containing information derived from the statement, and any record created as a result of the notice required by paragraph (1)(A)(i)(III);

**(ii)** the information contained in the statement shall not be conveyed to any person except a person who has a need to know in order to carry out this subsection; and

**(iii)** the information contained in the statement shall not be used for any purpose other than to carry out this subsection.

**(C)** If a chief law enforcement officer determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination, the officer shall provide such reasons to the individual in writing within 20 business days after receipt of the request.

**(7)** A chief law enforcement officer or other person responsible for providing criminal history background information pursuant to this subsection shall not be liable in an action at law for damages--

**(A)** for failure to prevent the sale or transfer of a handgun to a person whose receipt or possession of the handgun is unlawful under this section; or

**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a handgun.

**(8)** For purposes of this subsection, the term "chief law enforcement officer" means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

**(9)** The Attorney General shall take necessary actions to ensure that the provisions of this subsection are published and disseminated to licensed dealers, law enforcement officials, and the public.

**(t)(1)** Beginning on the date that is 30 days after the Attorney General notifies licensees under section 103(d) of the Brady Handgun Violence Prevention Act that the national instant criminal background check system is established, a licensed importer, licensed manufacturer, or licensed dealer shall not transfer a firearm to any other person who is not licensed under this chapter, unless--

**(A)** before the completion of the transfer, the licensee contacts the national instant criminal background check system established under section 103 of that Act;

**(B)(i)** the system provides the licensee with a unique identification number; or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

25

Case: 11-50107      07/21/2011      ID: 7828535      DktEntry: 6      Page: 95 of 132

**(ii)** 3 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section; and

**(C)** the transferor has verified the identity of the transferee by examining a valid identification document (as defined in section 1028(d) of this title) of the transferee containing a photograph of the transferee.

**(2)** If receipt of a firearm would not violate subsection (g) or (n) or State law, the system shall--

**(A)** assign a unique identification number to the transfer;

**(B)** provide the licensee with the number; and

**(C)** destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer.

**(3)** Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if--

**(A)(i)** such other person has presented to the licensee a permit that--

**(I)** allows such other person to possess or acquire a firearm; and

**(II)** was issued not more than 5 years earlier by the State in which the transfer is to take place; and

**(ii)** the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law;

**(B)** the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

**(C)** on application of the transferor, the Attorney General has certified that compliance with paragraph (1)(A) is impracticable because--

**(i)** the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

**(ii)** the business premises of the licensee at which the transfer is to occur are extremely remote in relation to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

26

Case: 11-50107      07/21/2011      ID: 7828535      DktEntry: 6      Page: 96 of 132

the chief law enforcement officer (as defined in subsection (s)(8)); and

(iii) there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

(4) If the national instant criminal background check system notifies the licensee that the information available to the system does not demonstrate that the receipt of a firearm by such other person would violate subsection (g) or (n) or State law, and the licensee transfers a firearm to such other person, the licensee shall include in the record of the transfer the unique identification number provided by the system with respect to the transfer.

(5) If the licensee knowingly transfers a firearm to such other person and knowingly fails to comply with paragraph (1) of this subsection with respect to the transfer and, at the time such other person most recently proposed the transfer, the national instant criminal background check system was operating and information was available to the system demonstrating that receipt of a firearm by such other person would violate subsection (g) or (n) of this section or State law, the Attorney General may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under section 923, and may impose on the licensee a civil fine of not more than $5,000.

(6) Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages--

(A) for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or

(B) for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.

(u) It shall be unlawful for a person to steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce.

[(v), (w) Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000]

(x)(1) It shall be unlawful for a person to sell, deliver, or otherwise transfer to a person who the transferor knows or has reasonable cause to believe is a juvenile--

(A) a handgun; or

(B) ammunition that is suitable for use only in a handgun.

Case: 11-50107     07/21/2011     ID: 7828535     DktEntry: 6     Page: 97 of 132

**(2)** It shall be unlawful for any person who is a juvenile to knowingly possess--

   **(A)** a handgun; or

   **(B)** ammunition that is suitable for use only in a handgun.

**(3)** This subsection does not apply to--

   **(A)** a temporary transfer of a handgun or ammunition to a juvenile or to the possession or use of a handgun or ammunition by a juvenile if the handgun and ammunition are possessed and used by the juvenile--

      **(i)** in the course of employment, in the course of ranching or farming related to activities at the residence of the juvenile (or on property used for ranching or farming at which the juvenile, with the permission of the property owner or lessee, is performing activities related to the operation of the farm or ranch), target practice, hunting, or a course of instruction in the safe and lawful use of a handgun;

      **(ii)** with the prior written consent of the juvenile's parent or guardian who is not prohibited by Federal, State, or local law from possessing a firearm, except--

         **(I)** during transportation by the juvenile of an unloaded handgun in a locked container directly from the place of transfer to a place at which an activity described in clause (i) is to take place and transportation by the juvenile of that handgun, unloaded and in a locked container, directly from the place at which such an activity took place to the transferor; or

         **(II)** with respect to ranching or farming activities as described in clause (i), a juvenile may possess and use a handgun or ammunition with the prior written approval of the juvenile's parent or legal guardian and at the direction of an adult who is not prohibited by Federal, State or local law from possessing a firearm;

      **(iii)** the juvenile has the prior written consent in the juvenile's possession at all times when a handgun is in the possession of the juvenile; and

      **(iv)** in accordance with State and local law;

   **(B)** a juvenile who is a member of the Armed Forces of the United States or the National Guard who possesses or is armed with a handgun in the line of duty;

   **(C)** a transfer by inheritance of title (but not possession) of a handgun or ammunition to a juvenile; or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

28

**(D)** the possession of a handgun or ammunition by a juvenile taken in defense of the juvenile or other persons against an intruder into the residence of the juvenile or a residence in which the juvenile is an invited guest.

**(4)** A handgun or ammunition, the possession of which is transferred to a juvenile in circumstances in which the transferor is not in violation of this subsection shall not be subject to permanent confiscation by the Government if its possession by the juvenile subsequently becomes unlawful because of the conduct of the juvenile, but shall be returned to the lawful owner when such handgun or ammunition is no longer required by the Government for the purposes of investigation or prosecution.

**(5)** For purposes of this subsection, the term "juvenile" means a person who is less than 18 years of age.

**(6)(A)** In a prosecution of a violation of this subsection, the court shall require the presence of a juvenile defendant's parent or legal guardian at all proceedings.

**(B)** The court may use the contempt power to enforce subparagraph (A).

**(C)** The court may excuse attendance of a parent or legal guardian of a juvenile defendant at a proceeding in a prosecution of a violation of this subsection for good cause shown.

**(y)** Provisions relating to aliens admitted under nonimmigrant visas--

**(1) Definitions.**--In this subsection--

**(A)** the term "alien" has the same meaning as in section 101(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(3)); and

**(B)** the term "nonimmigrant visa" has the same meaning as in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)).

**(2) Exceptions.**--Subsections (d)(5)(B), (g)(5)(B), and (s)(3)(B)(v)(II) do not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is--

**(A)** admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States;

**(B)** an official representative of a foreign government who is--

**(i)** accredited to the United States Government or the Government's mission to an international organization

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

having its headquarters in the United States; or

**(ii)** en route to or from another country to which that alien is accredited;

**(C)** an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; or

**(D)** a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business.

**(3) Waiver--**

**(A)** Conditions for waiver.--Any individual who has been admitted to the United States under a nonimmigrant visa may receive a waiver from the requirements of subsection (g)(5), if--

**(i)** the individual submits to the Attorney General a petition that meets the requirements of subparagraph (C); and

**(ii)** the Attorney General approves the petition.

**(B)** Petition.--Each petition under subparagraph (B) shall--

**(i)** demonstrate that the petitioner has resided in the United States for a continuous period of not less than 180 days before the date on which the petition is submitted under this paragraph; and

**(ii)** include a written statement from the embassy or consulate of the petitioner, authorizing the petitioner to acquire a firearm or ammunition and certifying that the alien would not, absent the application of subsection (g)(5)(B), otherwise be prohibited from such acquisition under subsection (g).

**(C)** Approval of petition.--The Attorney General shall approve a petition submitted in accordance with this paragraph, if the Attorney General determines that waiving the requirements of subsection (g)(5)(B) with respect to the petitioner--

**(i)** would be in the interests of justice; and

**(ii)** would not jeopardize the public safety.

**(z) Secure gun storage or safety device.--**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(1) In general.**--Except as provided under paragraph (2), it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer any handgun to any person other than any person licensed under this chapter, unless the transferee is provided with a secure gun storage or safety device (as defined in section 921(a)(34)) for that handgun.

**(2) Exceptions.**--Paragraph (1) shall not apply to--

**(A)(i)** the manufacture for, transfer to, or possession by, the United States, a department or agency of the United States, a State, or a department, agency, or political subdivision of a State, of a handgun; or

**(ii)** the transfer to, or possession by, a law enforcement officer employed by an entity referred to in clause (i) of a handgun for law enforcement purposes (whether on or off duty); or

**(B)** the transfer to, or possession by, a rail police officer employed by a rail carrier and certified or commissioned as a police officer under the laws of a State of a handgun for purposes of law enforcement (whether on or off duty);

**(C)** the transfer to any person of a handgun listed as a curio or relic by the Secretary pursuant to section 921(a)(13); or

**(D)** the transfer to any person of a handgun for which a secure gun storage or safety device is temporarily unavailable for the reasons described in the exceptions stated in section 923(e), if the licensed manufacturer, licensed importer, or licensed dealer delivers to the transferee within 10 calendar days from the date of the delivery of the handgun to the transferee a secure gun storage or safety device for the handgun.

**(3) Liability for use.**--

**(A) In general.**--Notwithstanding any other provision of law, a person who has lawful possession and control of a handgun, and who uses a secure gun storage or safety device with the handgun, shall be entitled to immunity from a qualified civil liability action.

**(B) Prospective actions.**--A qualified civil liability action may not be brought in any Federal or State court.

**(C) Defined term.**--As used in this paragraph, the term "qualified civil liability action"--

**(i)** means a civil action brought by any person against a person described in subparagraph (A) for damages resulting from the criminal or unlawful misuse of the handgun by a third party, if--

**(I)** the handgun was accessed by another person who did not have the permission or authorization of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

person having lawful possession and control of the handgun to have access to it; and

**(II)** at the time access was gained by the person not so authorized, the handgun had been made inoperable by use of a secure gun storage or safety device; and

**(ii)** shall not include an action brought against the person having lawful possession and control of the handgun for negligent entrustment or negligence per se.

### [APPENDIX A Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000]

CREDIT(S)

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 228, and amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1216; Pub.L. 97-377, Title I, § 165(a), Dec. 21, 1982, 96 Stat. 1923; Pub.L. 99-308, § 102, May 19, 1986, 100 Stat. 451; Pub.L. 99-408, § 2, Aug. 28, 1986, 100 Stat. 920; Pub.L. 100-649, § 2(a), (f)(2)(A), Nov. 10, 1988, 102 Stat. 3816, 3818; Pub.L. 100-690, Title VII, § 7060(c), Nov. 18, 1988, 102 Stat. 4404; Pub.L. 101-647, Title XVII, § 1702(b)(1), Title XXII, §§ 2201, 2202, 2204(b), Title XXXV, § 3524, Nov. 29, 1990, 104 Stat. 4844, 4856, 4857, 4924; Pub.L. 103-159, Title I, § 102(a)(1), (b), Title III, § 302(a) to (c), Nov. 30, 1993, 107 Stat. 1536, 1539, 1545; Pub.L. 103-322, Title XI, §§ 110102(a), 110103(a), 110105(2), 110106, 110201(a), 110401(b), (c), 110511, 110514, Title XXXII, §§ 320904, 320927, Title XXXIII, § 330011(i), Sept. 13, 1994, 108 Stat. 1996, 1998, 2000, 2010, 2014, 2019, 2125, 2131, 2145; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title VI, §§ 657, 658(b)], Sept. 30, 1996, 110 Stat. 3009-369, 3009-372; Pub.L. 104-294, Title VI, § 603(b), (c)(1), (d) to (f)(1), (g), Oct. 11, 1996, 110 Stat. 3503, 3504; Pub.L. 105-277, Div. A, § 101(b) [Title I, § 121], Oct. 21, 1998, 112 Stat. 2681-71; Pub.L. 107-273, Div. B, Title IV, § 4003(a)(1), Nov. 2, 2002, 116 Stat. 1811; Pub.L. 107-296, Title XI, § 1112(f)(4), (6), Nov. 25, 2002, 116 Stat. 2276; Pub.L. 109-92, §§ 5(c)(1), 6(a), Oct. 26, 2005, 119 Stat. 2099, 2101.)

[FN1] So in original. Probably should be followed with "and".

[FN2] So in original. The word "who" probably should not appear.

[FN3] So in original. Probably should be "of the".

REPEAL OF SUBSEC. (P)

<Pub.L. 100-649, § 2(f)(2)(A), Nov. 10, 1988, 102 Stat. 3818, as amended Pub.L. 105-277, Div. A, § 101(h) [Title VI, § 649], Oct. 21, 1998, 112 Stat. 2681-528; Pub.L. 108-174, § 1(1), Dec. 9, 2003, 117 Stat. 2481, provided that, effective 25 years after the 30th day beginning after Nov. 10, 1988 [see section 2(f)(1) of Pub.L. 100-649, set out as a note under this section], subsec. (p) of this section is repealed.>

2005 Acts. Pub.L. 109-92, § 5(d), Oct. 26, 2005, 119 Stat. 2101, provided that: "This section and the amend-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ments made by this section [enacting subsec. (z) of this section and amending 18 U.S.C.A. § 924 and enacting provisions set out as notes under this section and 18 U.S.C.A. § 921] shall take effect 180 days after the date of enactment of this Act [Oct. 26, 2005]."

2002 Acts. Amendment to this section by Pub.L. 107-296 effective 60 days after Nov. 25, 2002, see Pub.L. 107-296, § 4, set out as a note under 6 U.S.C.A. § 101.

Current through P.L. 112-23 approved 6-29-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

# ADDENDUM C

West's Ann.Cal.Const. Art. 2, § 4                                                    Page 1

C

**Effective:[See Text Amendments]**

West's Annotated California Codes Currentness
  Constitution of the State of California 1879 (Refs & Annos)
    Article II. Voting, Initiative and Referendum, and Recall (Refs & Annos)
      → **§ 4. Improper practices; certain persons as electors; prohibition**

Sec. 4. The Legislature shall prohibit improper practices that affect elections and shall provide for the disqualification of electors while mentally incompetent or imprisoned or on parole for the conviction of a felony.

CREDIT(S)

(Formerly Art. 2, § 3, added Nov. 7, 1972. Amended Nov. 5, 1974. Renumbered Art. 2, § 4, June 8, 1976.)

Current with urgency legislation through Ch. 38, 40 and 45 of 2011 Reg.Sess. and Ch. 7 of 2011-2012 1st Ex.Sess.

(C) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

# ADDENDUM D

**C**

**Effective:[See Text Amendments]**

West's Annotated California Codes Currentness
  Constitution of the State of California 1879 (Refs & Annos)
    Article VII. Public Officers and Employees (Refs & Annos)
      → **§ 8. Bribe to procure election or appointment; disqualification; exclusion from office and juries for certain crimes; regulations; corrupt practices**

Sec. 8. (a) Every person shall be disqualified from holding any office of profit in this State who shall have been convicted of having given or offered a bribe to procure personal election or appointment.

(b) Laws shall be made to exclude persons convicted of bribery, perjury, forgery, malfeasance in office, or other high crimes from office or serving on juries. The privilege of free suffrage shall be supported by laws regulating elections and prohibiting, under adequate penalties, all undue influence thereon from power, bribery, tumult, or other improper practice.

CREDIT(S)

(Adopted June 8, 1976.)

Current with urgency legislation through Ch. 38, 40 and 45 of 2011 Reg.Sess. and Ch. 7 of 2011-2012 1st Ex.Sess.

(C) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

# ADDENDUM E

West's Ann.Cal.Penal Code § 273.5                                    Page 1



**Effective: January 1, 2008**

West's Annotated California Codes Currentness
    Penal Code (Refs & Annos)
      Part 1. Of Crimes and Punishments
        Title 9. Of Crimes Against the Person Involving Sexual Assault, and Crimes Against Public Decency and Good Morals (Refs & Annos)
          Chapter 2. Abandonment and Neglect of Children
            ➡ **§ 273.5. Willful infliction of corporal injury; violation; punishment**

(a) Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine and imprisonment.

(b) Holding oneself out to be the husband or wife of the person with whom one is cohabiting is not necessary to constitute cohabitation as the term is used in this section.

(c) As used in this section, "traumatic condition" means a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force.

(d) For the purpose of this section, a person shall be considered the father or mother of another person's child if the alleged male parent is presumed the natural father under Sections 7611 and 7612 of the Family Code.

(e)(1) Any person convicted of violating this section for acts occurring within seven years of a previous conviction under subdivision (a), or subdivision (d) of Section 243, or Section 243.4, 244, 244.5, or 245, shall be punished by imprisonment in a county jail for not more than one year, or by imprisonment in the state prison for two, four, or five years, or by both imprisonment and a fine of up to ten thousand dollars ($10,000).

(2) Any person convicted of a violation of this section for acts occurring within seven years of a previous conviction under subdivision (e) of Section 243 shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to ten thousand dollars ($10,000), or by both that imprisonment and fine.

(f) If probation is granted to any person convicted under subdivision (a), the court shall impose probation consistent with the provisions of Section 1203.097.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(g) If probation is granted, or the execution or imposition of a sentence is suspended, for any defendant convicted under subdivision (a) who has been convicted of any prior offense specified in subdivision (e), the court shall impose one of the following conditions of probation:

(1) If the defendant has suffered one prior conviction within the previous seven years for a violation of any offense specified in subdivision (e), it shall be a condition thereof, in addition to the provisions contained in Section 1203.097, that he or she be imprisoned in a county jail for not less than 15 days.

(2) If the defendant has suffered two or more prior convictions within the previous seven years for a violation of any offense specified in subdivision (e), it shall be a condition of probation, in addition to the provisions contained in Section 1203.097, that he or she be imprisoned in a county jail for not less than 60 days.

(3) The court, upon a showing of good cause, may find that the mandatory imprisonment required by this subdivision shall not be imposed and shall state on the record its reasons for finding good cause.

(h) If probation is granted upon conviction of a violation of subdivision (a), the conditions of probation may include, consistent with the terms of probation imposed pursuant to Section 1203.097, in lieu of a fine, one or both of the following requirements:

(1) That the defendant make payments to a battered women's shelter, up to a maximum of five thousand dollars ($5,000), pursuant to Section 1203.097.

(2) That the defendant reimburse the victim for reasonable costs of counseling and other reasonable expenses that the court finds are the direct result of the defendant's offense.

For any order to pay a fine, make payments to a battered women's shelter, or pay restitution as a condition of probation under this subdivision, the court shall make a determination of the defendant's ability to pay. In no event shall any order to make payments to a battered women's shelter be made if it would impair the ability of the defendant to pay direct restitution to the victim or court-ordered child support. Where the injury to a married person is caused in whole or in part by the criminal acts of his or her spouse in violation of this section, the community property may not be used to discharge the liability of the offending spouse for restitution to the injured spouse, required by Section 1203.04, as operative on or before August 2, 1995, or Section 1202.4, or to a shelter for costs with regard to the injured spouse and dependents, required by this section, until all separate property of the offending spouse is exhausted.

(i) Upon conviction under subdivision (a), the sentencing court shall also consider issuing an order restraining the defendant from any contact with the victim, which may be valid for up to 10 years, as determined by the court. It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family. This protective order may be issued by the court whether the defendant is sentenced to state prison, county jail, or if imposition of sentence is suspended and the defendant is placed on probation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

CREDIT(S)

(Added by Stats.1977, c. 912, p. 2786, § 3. Amended by Stats.1980, c. 1117, p. 3589, § 3; Stats.1985, c. 563, § 1; Stats.1987, c. 415, § 2; Stats.1988, c. 576, § 1, eff. Aug. 26, 1988; Stats.1990, c. 680 (A.B.2632), § 1; Stats.1992, c. 163 (A.B.2641), § 104; Stats.1992, c. 183 (S.B.1545), § 1; Stats.1992, c. 184 (A.B.2439), § 3; Stats.1993, c. 219 (A.B.1500), § 216.4; Stats.1993-94, 1st Ex.Sess., c. 28 (A.B.93), § 2, eff. Nov. 30, 1994; Stats.1996, c. 1075 (S.B.1444), § 15; Stats.1996, c. 1077 (A.B.2898), § 16; Stats.1999, c. 660 (S.B.563), § 2; Stats.1999, c. 662 (S.B.218), § 9.5; Stats.2000, c. 287 (S.B.1955), § 5; Stats.2003, c. 262 (A.B.134), § 1; Stats.2007, c. 582 (A.B.289), § 1.)

Current with urgency legislation through Ch. 38, 40 and 45 of 2011 Reg.Sess. and Ch. 7 of 2011-2012 1st Ex.Sess.

(C) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# ADDENDUM F



**Effective: January 1, 2010 to December 31, 2011**

West's Annotated California Codes Currentness
    Penal Code (Refs & Annos)
        Part 2. Of Criminal Procedure (Refs & Annos)
            Title 8. Of Judgment and Execution
                Chapter 1. The Judgment (Refs & Annos)
                    → **§ 1203.4. Discharged petitioner; change of plea or vacation of verdict; dismissal of charge; release from penalties and disabilities; certificate of rehabilitation and pardon; application; pleading prior conviction in prosecution of subsequent offense; disclosure; firearms; reimbursement of costs; notice of petition for relief; pardon**

<Section operative until Jan. 1, 2012. See, also, section operative Jan. 1, 2012.>

(a) In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation, or in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under this section, the defendant shall, at any time after the termination of the period of probation, if he or she is not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw his or her plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if he or she has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in either case, the court shall thereupon dismiss the accusations or information against the defendant and except as noted below, he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted, except as provided in Section 13555 of the Vehicle Code. The probationer shall be informed, in his or her probation papers, of this right and privilege and his or her right, if any, to petition for a certificate of rehabilitation and pardon. The probationer may make the application and change of plea in person or by attorney, or by the probation officer authorized in writing. However, in any subsequent prosecution of the defendant for any other offense, the prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed. The order shall state, and the probationer shall be informed, that the order does not relieve him or her of the obligation to disclose the conviction in response to any direct question contained in any questionnaire or application for public office, for licensure by any state or local agency, or for contracting with the California State Lottery.

Dismissal of an accusation or information pursuant to this section does not permit a person to own, possess, or have in his or her custody or control any firearm or prevent his or her conviction under Section 12021.

Dismissal of an accusation or information underlying a conviction pursuant to this section does not permit a person prohibited from holding public office as a result of that conviction to hold public office.

Case: 11-50107    07/21/2011    ID: 7828535    DktEntry: 6    Page: 113 of 132

This subdivision shall apply to all applications for relief under this section which are filed on or after November 23, 1970.

(b) Subdivision (a) of this section does not apply to any misdemeanor that is within the provisions of subdivision (b) of Section 42001 of the Vehicle Code, to any violation of subdivision (c) of Section 286, Section 288, subdivision (c) of Section 288a, Section 288.5, or subdivision (j) of Section 289, any felony conviction pursuant to subdivision (d) of Section 261.5, or to any infraction.

(c)(1) Except as provided in paragraph (2), subdivision (a) does not apply to a person who receives a notice to appear or is otherwise charged with a violation of an offense described in subdivisions (a) to (e), inclusive, of Section 12810 of the Vehicle Code.

(2) If a defendant who was convicted of a violation listed in paragraph (1) petitions the court, the court in its discretion and in the interests of justice, may order the relief provided pursuant to subdivision (a) to that defendant.

(d) A person who petitions for a change of plea or setting aside of a verdict under this section may be required to reimburse the court for the actual costs of services rendered, whether or not the petition is granted and the records are sealed or expunged, at a rate to be determined by the court not to exceed one hundred fifty dollars ($150), and to reimburse the county for the actual costs of services rendered, whether or not the petition is granted and the records are sealed or expunged, at a rate to be determined by the county board of supervisors not to exceed one hundred fifty dollars ($150), and to reimburse any city for the actual costs of services rendered, whether or not the petition is granted and the records are sealed or expunged, at a rate to be determined by the city council not to exceed one hundred fifty dollars ($150). Ability to make this reimbursement shall be determined by the court using the standards set forth in paragraph (2) of subdivision (g) of Section 987.8 and shall not be a prerequisite to a person's eligibility under this section. The court may order reimbursement in any case in which the petitioner appears to have the ability to pay, without undue hardship, all or any portion of the costs for services established pursuant to this subdivision.

(e) Relief shall not be granted under this section unless the prosecuting attorney has been given 15 days' notice of the petition for relief. The probation officer shall notify the prosecuting attorney when a petition is filed, pursuant to this section.

It shall be presumed that the prosecuting attorney has received notice if proof of service is filed with the court.

(f) If, after receiving notice pursuant to subdivision (e), the prosecuting attorney fails to appear and object to a petition for dismissal, the prosecuting attorney may not move to set aside or otherwise appeal the grant of that petition.

(g) Notwithstanding the above provisions or any other provision of law, the Governor shall have the right to pardon a person convicted of a violation of subdivision (c) of Section 286, Section 288, subdivision (c) of Section 288a, Section 288.5, or subdivision (j) of Section 289, if there are extraordinary circumstances.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

CREDIT(S)

(Added by Stats.1935, c. 604, p. 1709, § 5. Amended by Stats.1941, c. 1112, p. 2815, § 1; Stats.1951, c. 183, p. 434, § 1; Stats.1961, c. 1735, p. 3744, § 1; Stats.1967, c. 1271, p. 3076, § 1; Stats.1970, c. 539, p. 1035, § 1; Stats.1971, c. 333, p. 667, § 1; Stats.1976, c. 434, p. 1110, § 1; Stats.1978, c. 911, p. 2870, § 1; Stats.1979, c. 199, p. 443, § 6; Stats.1983, c. 1118, § 1; Stats.1985, c. 1472, § 1; Stats.1989, c. 917, § 11; Stats.1994, c. 882 (A.B.1327), § 1; Stats.1997, c. 61 (A.B.729), § 1; Stats.2000, c. 226 (A.B.2320), § 1, eff. Aug. 28, 2000; Stats.2003, c. 49 (A.B.580), § 1; Stats.2005, c. 704 (A.B.439), § 3; Stats.2005, c. 705 (S.B.67), § 5, eff. Oct. 7, 2005; Stats.2007, c. 161 (A.B.645), § 1; Stats.2008, c. 94 (A.B.2092), § 1; Stats.2009, c. 606 (S.B.676), § 7.)

Current with urgency legislation through Ch. 38, 40 and 45 of 2011 Reg.Sess. and Ch. 7 of 2011-2012 1st Ex.Sess.

(C) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

# ADDENDUM G



**Effective: January 1, 2011**

West's Annotated California Codes Currentness
  Penal Code (Refs & Annos)
    Part 2. Of Criminal Procedure (Refs & Annos)
      ⌐▣ Title 8. Of Judgment and Execution
        ⌐▣ Chapter 1. The Judgment (Refs & Annos)
          → **§ 1203.4a. Misdemeanor or infraction sentence served; dismissal of charge; release from penalties and disabilities; exceptions; subsequent offenses; reimbursement of city and county; notice to prosecuting attorney**

(a) Every defendant convicted of a misdemeanor and not granted probation, and every defendant convicted of an infraction, shall, at any time after the lapse of one year from the date of pronouncement of judgment, if he or she has fully complied with and performed the sentence of the court, is not then serving a sentence for any offense and is not under charge of commission of any crime and has, since the pronouncement of judgment, lived an honest and upright life and has conformed to and obeyed the laws of the land, be permitted by the court to withdraw his or her plea of guilty or nolo contendere and enter a plea of not guilty; or if he or she has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and in either case the court shall thereupon dismiss the accusatory pleading against the defendant, who shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted, except as provided in Section 12021.1 of this code or Section 13555 of the Vehicle Code. The defendant shall be informed of the provisions of this section, either orally or in writing, at the time he or she is sentenced. The defendant may make an application and change of plea in person or by attorney, or by the probation officer authorized in writing; provided, that in any subsequent prosecution of the defendant for any other offense, the prior conviction may be pleaded and proved and shall have the same effect as if relief had not been granted pursuant to this section.

This subdivision applies to convictions which occurred before, as well as those occurring after, the effective date of this section.

(b) Subdivision (a) does not apply to any misdemeanor falling within the provisions of Section 42002.1 of the Vehicle Code, or to any infraction falling within the provisions of Section 42001 of the Vehicle Code.

(c) A person who petitions for a dismissal of a charge under this section may be required to reimburse the county and the court for the cost of services rendered at a rate to be determined by the county board of supervisors for the county and by the court for the court, not to exceed sixty dollars ($60), and to reimburse any city for the cost of services rendered at a rate to be determined by the city council not to exceed sixty dollars ($60). Ability to make this reimbursement shall be determined by the court using the standards set forth in paragraph (2) of subdivision (g) of Section 987.8 and shall not be a prerequisite to a person's eligibility under this section. The court may order reimbursement in any case in which the petitioner appears to have the ability to pay,

© 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

42

without undue hardship, all or any portion of the cost for services established pursuant to this subdivision.

(d) A petition for dismissal of an infraction pursuant to this section shall be by written declaration, except upon a showing of compelling need. Dismissal of an infraction shall not be granted under this section unless the prosecuting attorney has been given at least 15 days' notice of the petition for dismissal. It shall be presumed that the prosecuting attorney has received notice if proof of service is filed with the court.

(e) Any determination of amount made by a court under this section shall be valid only if either (1) made under procedures adopted by the Judicial Council or (2) approved by the Judicial Council.

CREDIT(S)

(Added by Stats.1963, c. 1647, p. 3236, § 1. Amended by Stats.1965, c. 465, p. 1771, § 1; Stats.1965, c. 1324, p. 3211, § 1; Stats.1967, c. 1271, p. 3077, § 2; Stats.1969, c. 9, p. 61, § 1, eff. March 6, 1969; Stats.1978, c. 911, p. 2870, § 2; Stats.1981, c. 714, § 331; Stats.1983, c. 1118, § 2; Stats.1988, c. 1394, § 1; Stats.2001, c. 824 (A.B.1700), § 36; Stats.2005, c. 22 (S.B.1108), § 150; Stats.2010, c. 178 (S.B.1115), § 77, operative Jan. 1, 2012; Stats.2010, c. 99 (A.B.2582), § 1.)

Current with urgency legislation through Ch. 38, 40 and 45 of 2011 Reg.Sess. and Ch. 7 of 2011-2012 1st Ex.Sess.

(C) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

# ADDENDUM H



**Effective: January 1, 2011**

West's Annotated California Codes Currentness
   Penal Code (Refs & Annos)
     Part 4. Prevention of Crimes and Apprehension of Criminals (Refs & Annos)
      Title 2. Control of Deadly Weapons (Refs & Annos)
       Chapter 1. Firearms (Refs & Annos)
        Article 2. Unlawful Carrying and Possession of Weapons (Refs & Annos)
     ➡ **§ 12021. Specified convictions; narcotic addiction; condition of probation; restrictions on firearms possession; punishment; employment needs; relief from prohibition; justifiable violations**

<Section prior to amendment by Stats.2011, c. 15 (A.B.109), eff. April 4, 2011, operative no earlier than July 1, 2011, and only upon the creation and funding of a community corrections grant program. See, also, section as amended by Stats.2011, c. 15 (A.B.109), eff. April 4, 2011, operative no earlier than July 1, 2011, and only upon the creation and funding of a community corrections grant program.>

(a)(1) Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country or of an offense enumerated in subdivision (a), (b), or (d) of Section 12001.6, or who is addicted to the use of any narcotic drug, and who owns, purchases, receives, or has in his or her possession or under his or her custody or control any firearm is guilty of a felony.

(2) Any person who has two or more convictions for violating paragraph (2) of subdivision (a) of Section 417 and who owns, purchases, receives, or has in his or her possession or under his or her custody or control any firearm is guilty of a felony.

(b) Notwithstanding subdivision (a), any person who has been convicted of a felony or of an offense enumerated in Section 12001.6, when that conviction results from certification by the juvenile court for prosecution as an adult in an adult court under Section 707 of the Welfare and Institutions Code, and who owns or has in his or her possession or under his or her custody or control any firearm is guilty of a felony.

(c)(1) Except as provided in subdivision (a) or paragraph (2) of this subdivision, any person who has been convicted of a misdemeanor violation of Section 71, 76, 136.1, 136.5, or 140, subdivision (d) of Section 148, Section 171b, paragraph (1) of subdivision (a) of Section 171c, 171d, 186.28, 240, 241, 242, 243, 243.4, 244.5, 245, 245.5, 246.3, 247, 273.5, 273. 6, 417, 417.6, 422, 626.9, 646.9, 12023, or 12024, subdivision (b) or (d) of Section 12034, Section 12040, subdivision (b) of Section 12072, subdivision (a) of former Section 12100, Section 12220, 12320, or 12590, or Section 8100, 8101, or 8103 of the Welfare and Institutions Code, any firearm-related offense pursuant to Sections 871.5 and 1001.5 of the Welfare and Institutions Code, or of the conduct punished in paragraph (3) of subdivision (g) of Section 12072, and who, within 10 years of the conviction, owns,

purchases, receives, or has in his or her possession or under his or her custody or control, any firearm is guilty of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine. The court, on forms prescribed by the Department of Justice, shall notify the department of persons subject to this subdivision. However, the prohibition in this paragraph may be reduced, eliminated, or conditioned as provided in paragraph (2) or (3).

(2) Any person employed as a peace officer described in Section 830.1, 830.2, 830.31, 830.32, 830.33, or 830.5 whose employment or livelihood is dependent on the ability to legally possess a firearm, who is subject to the prohibition imposed by this subdivision because of a conviction under Section 273.5, 273.6, or 646.9, may petition the court only once for relief from this prohibition. The petition shall be filed with the court in which the petitioner was sentenced. If possible, the matter shall be heard before the same judge who sentenced the petitioner. Upon filing the petition, the clerk of the court shall set the hearing date and shall notify the petitioner and the prosecuting attorney of the date of the hearing. Upon making each of the following findings, the court may reduce or eliminate the prohibition, impose conditions on reduction or elimination of the prohibition, or otherwise grant relief from the prohibition as the court deems appropriate:

(A) Finds by a preponderance of the evidence that the petitioner is likely to use a firearm in a safe and lawful manner.

(B) Finds that the petitioner is not within a prohibited class as specified in subdivision (a), (b), (d), (e), or (g) or Section 12021.1, and the court is not presented with any credible evidence that the petitioner is a person described in Section 8100 or 8103 of the Welfare and Institutions Code.

(C)(i) Finds that the petitioner does not have a previous conviction under this subdivision no matter when the prior conviction occurred.

(ii) In making its decision, the court shall consider the petitioner's continued employment, the interest of justice, any relevant evidence, and the totality of the circumstances. The court shall require, as a condition of granting relief from the prohibition under this section, that the petitioner agree to participate in counseling as deemed appropriate by the court. Relief from the prohibition shall not relieve any other person or entity from any liability that might otherwise be imposed. It is the intent of the Legislature that courts exercise broad discretion in fashioning appropriate relief under this paragraph in cases in which relief is warranted. However, nothing in this paragraph shall be construed to require courts to grant relief to any particular petitioner. It is the intent of the Legislature to permit persons who were convicted of an offense specified in Section 273.5, 273.6, or 646.9 to seek relief from the prohibition imposed by this subdivision.

(3) Any person who is subject to the prohibition imposed by this subdivision because of a conviction of an offense prior to that offense being added to paragraph (1) may petition the court only once for relief from this prohibition. The petition shall be filed with the court in which the petitioner was sentenced. If possible, the matter shall be heard before the same judge that sentenced the petitioner. Upon filing the petition, the clerk of the court shall set the hearing date and notify the petitioner and the prosecuting attorney of the date of the hearing. Upon

making each of the following findings, the court may reduce or eliminate the prohibition, impose conditions on reduction or elimination of the prohibition, or otherwise grant relief from the prohibition as the court deems appropriate:

(A) Finds by a preponderance of the evidence that the petitioner is likely to use a firearm in a safe and lawful manner.

(B) Finds that the petitioner is not within a prohibited class as specified in subdivision (a), (b), (d), (e), or (g) or Section 12021.1, and the court is not presented with any credible evidence that the petitioner is a person described in Section 8100 or 8103 of the Welfare and Institutions Code.

(C)(i) Finds that the petitioner does not have a previous conviction under this subdivision, no matter when the prior conviction occurred.

(ii) In making its decision, the court may consider the interest of justice, any relevant evidence, and the totality of the circumstances. It is the intent of the Legislature that courts exercise broad discretion in fashioning appropriate relief under this paragraph in cases in which relief is warranted. However, nothing in this paragraph shall be construed to require courts to grant relief to any particular petitioner.

(4) Law enforcement officials who enforce the prohibition specified in this subdivision against a person who has been granted relief pursuant to paragraph (2) or (3) shall be immune from any liability for false arrest arising from the enforcement of this subdivision unless the person has in his or her possession a certified copy of the court order that granted the person relief from the prohibition. This immunity from liability shall not relieve any person or entity from any other liability that might otherwise be imposed.

(d)(1) Any person who, as an express condition of probation, is prohibited or restricted from owning, possessing, controlling, receiving, or purchasing a firearm and who owns, purchases, receives, or has in his or her possession or under his or her custody or control, any firearm but who is not subject to subdivision (a) or (c) is guilty of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine. The court, on forms provided by the Department of Justice, shall notify the department of persons subject to this subdivision. The notice shall include a copy of the order of probation and a copy of any minute order or abstract reflecting the order and conditions of probation.

(2) For any person who is subject to subdivision (a), (b), or (c), the court shall, at the time judgment is imposed, provide on a form supplied by the Department of Justice, a notice to the defendant prohibited by this section from owning, purchasing, receiving, possessing or having under his or her custody or control, any firearm. The notice shall inform the defendant of the prohibition regarding firearms and include a form to facilitate the transfer of firearms. Failure to provide the notice shall not be a defense to a violation of this section.

(e) Any person who (1) is alleged to have committed an offense listed in subdivision (b) of Section 707 of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

46

Welfare and Institutions Code, an offense described in subdivision (b) of Section 1203.073, any offense enumerated in paragraph (1) of subdivision (c), or any offense described in subdivision (a) of Section 12025, subdivision (a) of Section 12031, or subdivision (a) of Section 12034, and (2) is subsequently adjudged a ward of the juvenile court within the meaning of Section 602 of the Welfare and Institutions Code because the person committed an offense listed in subdivision (b) of Section 707 of the Welfare and Institutions Code, an offense described in subdivision (b) of Section 1203.073, any offense enumerated in paragraph (1) of subdivision (c), or any offense described in subdivision (a) of Section 12025, subdivision (a) of Section 12031, or subdivision (a) of Section 12034, shall not own, or have in his or her possession or under his or her custody or control, any firearm until the age of 30 years. A violation of this subdivision shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine. The juvenile court, on forms prescribed by the Department of Justice, shall notify the department of persons subject to this subdivision. Notwithstanding any other law, the forms required to be submitted to the department pursuant to this subdivision may be used to determine eligibility to acquire a firearm.

(f) Subdivision (a) shall not apply to a person who has been convicted of a felony under the laws of the United States unless either of the following criteria is satisfied:

(1) Conviction of a like offense under California law can only result in imposition of felony punishment.

(2) The defendant was sentenced to a federal correctional facility for more than 30 days, or received a fine of more than one thousand dollars ($1,000), or received both punishments.

(g)(1) Every person who purchases or receives, or attempts to purchase or receive, a firearm knowing that he or she is prohibited from doing so by a temporary restraining order or injunction issued pursuant to Section 527.6 or 527.8 of the Code of Civil Procedure, a protective order as defined in Section 6218 of the Family Code, a protective order issued pursuant to Section 136.2 or 646.91 of this code, or a protective order issued pursuant to Section 15657.03 of the Welfare and Institutions Code, is guilty of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine.

(2) Every person who owns or possesses a firearm knowing that he or she is prohibited from doing so by a temporary restraining order or injunction issued pursuant to Section 527.6 or 527.8 of the Code of Civil Procedure, a protective order as defined in Section 6218 of the Family Code, a protective order issued pursuant to Section 136.2 or 646.91 of this code, or a protective order issued pursuant to Section 15657.03 of the Welfare and Institutions Code, is guilty of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine.

(3) The Judicial Council shall provide notice on all protective orders that the respondent is prohibited from owning, possessing, purchasing, receiving, or attempting to purchase or receive a firearm while the protective order is in effect. The order shall also state that the firearm shall be relinquished to the local law enforcement agency for that jurisdiction or sold to a licensed gun dealer, and that proof of surrender or sale shall be filed within a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

specified time of receipt of the order. The order shall state the penalties for a violation of the prohibition. The order shall also state on its face the expiration date for relinquishment.

(4) If probation is granted upon conviction of a violation of this subdivision, the court shall impose probation consistent with Section 1203.097.

(h)(1) A violation of subdivision (a), (b), (c), (d), or (e) is justifiable where all of the following conditions are met:

(A) The person found the firearm or took the firearm from a person who was committing a crime against him or her.

(B) The person possessed the firearm no longer than was necessary to deliver or transport the firearm to a law enforcement agency for that agency's disposition according to law.

(C) If the firearm was transported to a law enforcement agency, it was transported in accordance with paragraph (18) of subdivision (a) of Section 12026.2.

(D) If the firearm is being transported to a law enforcement agency, the person transporting the firearm has given prior notice to the law enforcement agency that he or she is transporting the firearm to the law enforcement agency for disposition according to law.

(2) Upon the trial for violating subdivision (a), (b), (c), (d), or (e), the trier of fact shall determine whether the defendant was acting within the provisions of the exemption created by this subdivision.

(3) The defendant has the burden of proving by a preponderance of the evidence that he or she comes within the provisions of the exemption created by this subdivision.

(i) Subject to available funding, the Attorney General, working with the Judicial Council, the California Alliance Against Domestic Violence, prosecutors, and law enforcement, probation, and parole officers, shall develop a protocol for the implementation of the provisions of this section. The protocol shall be designed to facilitate the enforcement of restrictions on firearm ownership, including provisions for giving notice to defendants who are restricted, provisions for informing those defendants of the procedures by which defendants shall dispose of firearms when required to do so, provisions explaining how defendants shall provide proof of the lawful disposition of firearms, and provisions explaining how defendants may obtain possession of seized firearms when legally permitted to do so pursuant to this section or any other provision of law. The protocol shall be completed on or before January 1, 2005.

CREDIT(S)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 11-50107   07/21/2011       ID: 7828535     DktEntry: 6     Page: 124 of 132

(Added by Stats.1953, c. 36, p. 654, § 1. Amended by Stats.1965, c. 931, p. 2545, § 1; Stats.1970, c. 1345, p. 2506, § 1, eff. Sept. 17, 1970; Stats.1974, c. 1197, p. 2588, § 1; Stats.1976, c. 1139, p. 5161, § 303, operative July 1, 1977; Stats.1982, c. 136, § 6, eff. March 26, 1982, operative April 25, 1982; Stats.1983, c. 1092, § 326.5, eff. Sept. 27, 1983, operative Jan. 1, 1984; Stats.1989, c. 254, § 1; Stats.1989, c. 1044, § 3; Stats.1990, c. 9 (A.B.497), § 2; Stats.1990, c. 1180 (A.B.1753), § 3; Stats.1991, c. 953 (A.B.108), § 4, eff. Oct. 14, 1991; Stats.1991, c. 955 (A.B.242), § 3; Stats.1992, c. 163 (A.B.2641), § 114, operative Jan. 1, 1994; Stats.1993, c. 219 (A.B.1500), § 221.3; Stats.1993, c. 297 (S.B.1184), § 1; Stats.1993, c. 600 (A.B.242), § 1; Stats.1993, c. 612 (A.B.685), § 2; Stats.1994, c. 146 (A.B.3601), § 170; Stats.1994, c. 23 (A.B.482), § 5; Stats.1994, c. 451 (A.B.2470), § 4; Stats.1993-94, 1st Ex.Sess., c. 27 (A.B.91), § 1; Stats.1994, 1st Ex.Sess., c. 29 (A.B.68), § 4; Stats.1993-94, 1st Ex.Sess., c. 33 (S.B.36), § 3; Stats.1993-94, 1st Ex.Sess., c. 33 (S.B.36), § 3.5; Stats.1995, c. 178 (S.B.23), § 1; Stats.1997, c. 143 (A.B.688), § 1; Stats.1997, c. 158 (A.B.78), § 2.5; Stats.1999, c. 662 (S.B.218), § 17; Stats.2000, c. 400 (A.B.1989), § 1; Stats.2001, c. 944 (S.B.950), § 3; Stats.2002, c. 830 (A.B.2695), § 2; Stats.2003, c. 490 (A.B.319), § 1; Stats.2003, c. 495 (A.B.1290), § 3; Stats.2003, c. 498 (S.B.226), § 8; Stats.2003, c. 499 (S.B.238), § 4.7; Stats.2004, c. 183 (A.B.3082), § 276; Stats.2004, c. 593 (S.B.1797), § 6; Stats.2006, c. 538 (S.B.1852), § 526; Stats.2008, c. 599 (S.B.1302), § 4; Stats.2010, c. 709 (S.B.1062), § 18; Stats.2010, c. 689 (A.B.2668), § 3.)

Current with urgency legislation through Ch. 38, 40 and 45 of 2011 Reg.Sess. and Ch. 7 of 2011-2012 1st Ex.Sess.

(C) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

49

# ADDENDUM I

C

**Effective:[See Text Amendments]**

West's Annotated California Codes Currentness
  Code of Civil Procedure (Refs & Annos)
    Part 1. Of Courts of Justice
      Title 3. Persons Specially Invested with Powers of a Judicial Nature (Refs & Annos)
        Chapter 1. Trial Jury Selection and Management Act (Refs & Annos)
          ➡ **§ 203. Persons qualified to be trial jurors; exceptions**

(a) All persons are eligible and qualified to be prospective trial jurors, except the following:

(1) Persons who are not citizens of the United States.

(2) Persons who are less than 18 years of age.

(3) Persons who are not domiciliaries of the State of California, as determined pursuant to Article 2 (commencing with Section 2020) of Chapter 1 of Division 2 of the Elections Code.

(4) Persons who are not residents of the jurisdiction wherein they are summoned to serve.

(5) Persons who have been convicted of malfeasance in office or a felony, and whose civil rights have not been restored.

(6) Persons who are not possessed of sufficient knowledge of the English language, provided that no person shall be deemed incompetent solely because of the loss of sight or hearing in any degree or other disability which impedes the person's ability to communicate or which impairs or interferes with the person's mobility.

(7) Persons who are serving as grand or trial jurors in any court of this state.

(8) Persons who are the subject of conservatorship.

(b) No person shall be excluded from eligibility for jury service in the State of California, for any reason other than those reasons provided by this section.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

50

CREDIT(S)

(Added by Stats.1988, c. 1245, § 2. Amended by Stats.1994, c. 923 (S.B.1546), § 1.)

Current with urgency legislation through Ch. 38, 40 and 45 of 2011 Reg.Sess. and Ch. 7 of 2011-2012 1st Ex.Sess.

(C) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

# ADDENDUM J



West's Kansas Statutes Annotated Currentness
   Chapter 21. Crimes and Punishments
      Part III. Classification of Crimes and Sentencing
         Article 46. Sentencing
         ➡ **21-4615. Rights of imprisoned persons; restoration**

(1) A person who has been convicted in any state or federal court of a felony shall, by reason of such conviction, be ineligible to hold any public office under the laws of the state of Kansas, or to register as a voter or to vote in any election held under the laws of the state of Kansas or to serve as a juror in any civil or criminal case.

(2) The ineligibilities imposed by this section shall attach upon conviction and shall continue until such person has completed the terms of the authorized sentence.

(3) The ineligibilities imposed upon a convicted person by this section shall be in addition to such other penalties as may be provided by law.

CREDIT(S)

Laws 1969, ch. 180, § 21-4615; Laws 1972, ch. 317, § 102; Laws 1986, ch. 123, § 14; Laws 1996, ch. 187, § 21; Laws 2002, ch. 19, § 3.

Current through 2010 regular session

(c) 2010 Thomson Reuters.

END OF DOCUMENT

# ADDENDUM K

K.S.A. 22-3722    Page 1

c

West's Kansas Statutes Annotated Currentness
  Chapter 22. Criminal Procedure
    Article 37. Release Procedures
    ➡ **22-3722. Service on parole, conditional release and postrelease supervision; discharge; restoration of civil rights**

The period served on parole or conditional release shall be deemed service of the term of confinement, and, subject to the provisions contained in K.S.A. 75-5217 and amendments thereto relating to an inmate who is a fugitive from or has fled from justice, the total time served may not exceed the maximum term or sentence. The period served on postrelease supervision shall vest in and be subject to the provisions contained in K.S.A. 75-5217 and amendments thereto relating to an inmate who is a fugitive from or has fled from justice. The total time served shall not exceed the postrelease supervision period established at sentencing.

When an inmate on parole or conditional release has performed the obligations of the release for such time as shall satisfy the Kansas parole board that final release is not incompatible with the best interest of society and the welfare of the individual, the parole board may make a final order of discharge and issue a certificate of discharge to the inmate but no such order of discharge shall be made in any case within a period of less than one year after the date of release except where the sentence expires earlier thereto. When an inmate has reached the end of the postrelease supervision period, the parole board shall issue a certificate of discharge to the releasee. Such discharge, and the discharge of an inmate who has served the inmate's term of imprisonment, shall have the effect of restoring all civil rights lost by operation of law upon commitment, and the certification of discharge shall so state. Nothing herein contained shall be held to impair the power of the governor to grant a pardon or commutation of sentence in any case.

CREDIT(S)

Laws 1970, ch. 129, § 22-3722; Laws 1972, ch. 317, § 95; Laws 1973, ch. 339, § 68; Laws 1990, ch. 309, § 22; Laws 1992, ch. 239, § 271.

Current through 2010 regular session

(c) 2010 Thomson Reuters.

END OF DOCUMENT

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | U.S.C.A. No. 11-50107 |
| | ) | U.S.D.C. No. 10CR1805-JAH |
| Plaintiff-Appellee, | ) | |
| | ) | CERTIFICATE OF SERVICE |
| v. | ) | |
| | ) | |
| **DANIEL EDWARD CHOVAN,** | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

I hereby certify that on July 21, 2011, I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users and  will mail copies of the printed brief identical to the version submitted electronically on July 21, 2011, pursuant to this Court's Order as follows:

1.     Seven (7) copies of the Brief, Four (4) sets of the Excerpts of record to U.S. Court of Appeals, and Four (4) copies of the Presentence Report filed *Under Seal* to 95 Seventh Avenue, San Francisco, California, 94103, P.O. Box 193939, San Francisco, California, 94119-3939, 95 Seventh Avenue, San Francisco, California, 94103;

2.     One (1) copy of the Brief and 1 (one) set of the Excerpts of Record to LAURA E. DUFFY, U.S. Attorney, Attention: Caroline Han, Assistant U.S. Attorney, 880 Front Street, San Diego, California  92101;

3.     That I caused to be delivered additional copies to Appellant-Defendant Defendant Daniel Edward Chovan.

I so state on July 21, 2011, in San Diego, California.

    *s/ Devin Burstein*_____
Federal Defenders of San Diego, Inc.