C.A. No. 11-50107

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DANIEL EDWARD CHOVAN,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of California
Honorable John A. Houston, District Judge

BRIEF FOR APPELLEE UNITED STATES

LAURA E. DUFFY
United States Attorney

BRUCE R. CASTETTER
Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division

CAROLINE P. HAN
Assistant U.S. Attorney

880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 557-5220

Attorneys for Plaintiff-Appellee
United States of America

# TOPICAL INDEX

Page

TABLE OF AUTHORITIES     iv

I     QUESTIONS PRESENTED     1

II     JURISDICTION     1

    A.     BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT     1

    B.     BASIS FOR JURISDICTION IN THE COURT OF APPEALS     2

    C.     THE NOTICE OF APPEAL WAS TIMELY     2

    D.     BAIL STATUS     2

III     STATEMENT OF THE CASE     2

    A.     PRIOR PROCEEDINGS     2

    B.     STATEMENT OF FACTS     3

       1.     Instant Offense     3

       2.     Chovan's Motion to Dismiss Indictment     6

       3.     Guilty Plea and Sentencing     6

IV     SUMMARY OF ARGUMENT     6

V     ARGUMENT     7

    A.     18 U.S.C. § 922(g)(9) IS A "PRESUMPTIVELY LAWFUL REGULATORY MEASURE" AS SET FORTH IN <u>HELLER</u>     7

i

1.    Introduction                                                      7

2.    Standard of Review                                          8

3.    Merits                                                            8

     a.   Background                                             8

     b.   Section 922 (g)(9) is Akin to § 922(g)(1), and
          This Court Can Apply the Same Analysis That the
          Vongxay Panel Applied to § 922(g)(1)              10

     c.   Congress' Power to Disarm Criminals Includes
          The Power to Disarm Domestic Violence
          Misdemeanants                                        14

     d.   Section 922(g)(9) is Lawful Prohibition in That
          it Is a Presumptively Lawful Regulatory Measure   15

B.   A REVIEW OF CHOVAN'S SECOND AMENDMENT
     CLAIM DEMONSTRATES THAT IT LACKS MERIT       19

     1.   The Substantial Burden Analysis of Nordyke Does Not
          Apply to Chovan's Claim                             20

     2.   Even Assuming That People Convicted of Misdemeanor
          Crimes of Domestic Violence Convictions Have Second
          Amendment Rights, Intermediate Scrutiny Should Be
          Applied                                                21

C.   CHOVAN'S CHALLENGE TO THE CONSTITUTIONALITY
     OF THE STATUTE AS APPLIED TO HIM MUST ALSO FAIL   26

     1.   Introduction                                         26

2.    Standard of Review                                              27

3.    Merits                                                                27

a.    Strict Scrutiny Does Not Apply to Chovan's
as Applied Challenge                                       27

b.    The Statute Survives Intermediate Scrutiny, and in
Any Event, He Cannot Distinguish Himself From
His Fellow Domestic Violence Misdemeanants        27

D.    CHOVAN IS PROPERLY SUBJECT TO PROSECUTION
UNDER THE STATUTE                                           30

1.    Introduction                                                        30

2.    Standard of Review                                              30

3.    Merits                                                                30

a.    Chovan's Civil Rights Were Never Restored        30

VI    CONCLUSION                                                           34

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Cases      Page

Board of Trustees of State University of N.Y. v. Fox,
    492 U.S. 469 (1989)      21

Central Hudson Gas & Electric Corp. v. Public Serv. Commission of N.Y.,
    447 U.S. 557 (1980)      23

Heller v. District of Columbia,
    128 S. Ct. 2783 (2008) 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 18, 20, 22, 26, 27, 33

In re Osborne,
    76 F.3d 306 (9th Cir. 1996)      12

In re United States,
    578 F.3d 1195 (10th Cir. 2009)      11

Logan v. United States,
    552 U.S. 23 (2007)      30

Martin v. Franklin Capital Corp.,
    546 U.S. 132 (2005)      10

Nordyke v. King,
    644 F.3d 776 (9th Cir. 2011)      20

Robertson v. Baldwin,
    165 U.S. 275 (1897)      14

Rutan v. Republic Party of Ill.,
    497 U.S. 62 (1990)      14

State Oil Co. v. Khan,
    52 U.S. 3 (1997)      33

State v. Hirsch,
    114 P.3d 1104 (Or. 2005)      14

| Cases | Page |
|---|---|
| United States v. Belless,<br>338 F.3d 1063 (9th Cir. 2003) | 23, 27 |
| United States v. Booker,<br>644 F.3d 12 (1st Cir. 2011) | 10, 22, 24 |
| United States v. Chester,<br>628 F.3d 673 (4th Cir. 2010) | 8-9, 23 |
| United States v. Dugan,<br>No. 08-10579 2011 WL 4359902 (9th Cir. September 20, 2011) | 12 |
| United States v. Hancock,<br>231 F.3d 557 (9th Cir. 2005) | 13, 32, 33 |
| United States v. Hayes,<br>129 S. Ct. 1079 (2009) | 11, 23, 24 |
| United States v. Laskie,<br>511 F.3d 894 (9th Cir. 2001) | 32 |
| United States v. Marzzarella,<br>614 F.3d 85 (3d Cir. 2010) | 22, 23 |
| United States v. Reese,<br>627 F.3d 792 (10th Cir. 2010) | 22 |
| United States v. Salerno,<br>481 U.S. 739 (1987) | 23 |
| United States v. Skoien,<br>614 F.3d 638 (7th Cir. 2010) | 18, 22, 24, 25, 28, 33 |
| United States v. Smith,<br>171 F.3d 617 (8th Cir.1999) | 33 |
| United States v. Smith,<br>742 F. Supp. 2d 855 (S.D.W.Va. 2010) | 24 |

| Cases | Page |
|---|---|
| United States v. Valerio,<br>441 F.3d 837 | 30, 31, 32 |
| United States v. Vongxay,<br>594 F.3d 1111 (9th Cir. 2010) | 8, 11, 12, 13, 19, 25, 26, 27, 30, 3 |
| United States v. White,<br>593 F.3d 1199 (11th Cir. 2010) | 10, 11 |
| United States v. Younger,<br>398 F.3d 1179 (9th Cir. 2005) | 12, 13 |
| Ward v. Rock Against Racism,<br>491 U.S. 781 (1989) | 21 |

Constitution and Statutes

| | |
|---|---|
| First Amendment | 23 |
| Second Amendment | 1, 6, 7, 8, 9, 12, 13, 14, 15, 16, 17, 19 |
| 18 U.S.C. § 921(a)(20) | 30, 31, 32 |
| 18 U.S.C. § 921(a)(33) | 21 |
| 18 U.S.C. § 921(a)(33)(B)(ii) | 7, 30, 32, 33 |
| 18 U.S.C. § 922 | 22, 23 |
| 18 U.S.C. § 922(g)(1) | 6, 7, 10, 11, 12, 13, 15, 24, 31, 32 |
| 18 U.S.C. § 922(g)(3) | 12 |
| 18 U.S.C. § 922(g)(8) | 22 |
| 18 U.S.C. § 922(g)(9) | 1, 2, 6, 7, 10, 11, 12, 13, 14,15, 20, 21, 24, 25, 27, 30, 31, 32 |
| 18 U.S.C. § 922(k) | 23 |

| Constitution and Statutes | Page |
|---|---|
| 18 U.S.C. § 924(a)(1)(A) | 2 |
| 18 U.S.C. § 3231 | 1 |
| 28 U.S.C. § 1291 | 2 |
| Cal. Const. art II, § 4 | 32 |
| Cal. Const. art VII, § 8 | 32 |
| Cal. Penal Code § 273.5 | 31 |
| Cal. Penal Code § 273.5(a) | 3 |
| Cal. Penal Code § 893(9)(3) | 32 |
| Cal. Penal Code § 12021 | 31 |
| Cal. Penal Code § 12021(c)(1) | 31, 32 |
| 1662 Militia Act | 16 |

Rules

| | |
|---|---|
| Fed. R. App. P. 4(b) | 2 |

Miscellaneous

| | |
|---|---|
| Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007) | 22 |
| Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment: Towards an Afro-Americanist Reconstruction*, 80 | 17 |
| Act of April 30, 1790, ch. 9 s. 25, 1 Stat. 117 | 16, 17 |
| George C. Thomas III, *Colonial Criminal Law and Procedure: The Royal Colony of New Jersey*, 1 N.Y.U. J. Of Law & Liberty, 671, 702 (2005) | 16 |

Miscellaneous                                                                            Page

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS, 123 (1994)                        16, 17

Linda E. Saltzman, James A. Mercy, Patrick W. O'Carroll, Mark L. Rosenberg
& Philip H.Rhodes, *Weapon Involvement and Injury Outcomes in Family and
Intimate Assaults*, 267 J. Am. Medical Ass'n 3043 (1992)                          25

Pa. Const., Decl. of Rights, Art. XIII                                            17

Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal,
and Textual Analysis of the English Right to Have Arms and Whether
the Second Amendment Should be Incorporated in* McDonald v. City of Chicago,
57 Clev. State L. Rev. 351, 373, 376, 382-83, 405 (2009)                         16

Robert Churchill, *Gun Regulation, the Police Power, and the Right to Keep
Arms in Early America: the Legal Context of the Second Amendment*,
25 Law & Hist. Rev. 139, 157 (2007)                                         17, 18

Saul Cornell, *Commonplace or Anachronism: the Standard Model,
the Second Amendment, and the Problem of History in Contemporary
Constitutional Theory* 16 Const. Comment. 221, 228-29 (1999)                16, 17

Saul Cornell, *"Don't Know Much About History": The Current Crisis
in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 672 (2002)          17-18

1 W & M. c.2 § 7, in Eng. Stat. at Large 441 (1698)                              15

2 SCHWARTZ, THE BILL OF RIGHTS, A DOCUMENTARY HISTORY, 674-75, 681      19

4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 95 (1769) 16

13 & 14 Car.2, c.3 § 1 (1662) (Eng)                                              16

132 Cong. Rec. 22, 986 (Sept. 12, 1996)                                          10

142 Cong. Rec. 22, 985 (1996)                                                    11

142 Cong. Rec. 22,986                                                            24

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | C.A. No. 11-50107 |
| | ) | D.C. No. 10CR1805-JAH |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL EDWARD CHOVAN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

I

QUESTIONS PRESENTED

A.    Whether 18 U.S.C. § 922(g)(9) is constitutional under the Second Amendment.

B.    Whether 18 U.S.C. § 922(g)(9) is constitutional under the Second Amendment as applied to Chovan.

C.    Whether Chovan's civil rights were restored such that he is not subject to prosecution under 18 U.S.C. § 922(g)(9).

II

JURISDICTION

A.    BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT

Daniel Edward Chovan ("Chovan") appeals from his conviction by conditional guilty plea for prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(9). The district court had original jurisdiction of the crime, which occurred in the Southern District of California, under 18 U.S.C. § 3231.

B.     BASIS FOR JURISDICTION IN THE COURT OF APPEALS

This Court has jurisdiction over appeals from final judgments of the district courts under 28 U.S.C. § 1291.  A judgment of conviction in a federal criminal case is a final order subject to appeal under 28 U.S.C. § 1291.

C.     THE NOTICE OF APPEAL WAS TIMELY

The  judgment in this case was entered on March 21, 2011.  [ER 162-64.][1/] Chovan filed his Notice of Appeal on March 22, 2011, which was within the 14 days allowed by Fed. R. App. P. 4(b).  [ER 161.]

D.     BAIL STATUS

Chovan is currently serving his sentence of 5 years' probation.  [ER 162-64,175.]

III

STATEMENT OF THE CASE

A.     PRIOR PROCEEDINGS

On May 12, 2010, a federal grand jury returned a two-count Indictment charging Chovan with prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(9) and false statement in acquisition of a firearm in violation of 18 U.S.C. § 924(a)(1)(A).  [ER 4-6.]  On November 9, 2010, Chovan entered a guilty plea to (preserving his right to appeal the district court denial of Chovan's pre-trial motions to dismiss to count one of the Indictment) to prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(9).  [ER 113-125.]

_____

[1/]     "ER" refers to Appellant Chovan's Excerpts of the Record.

2

B.    STATEMENT OF FACTS

1.    Instant Offense

On August 15, 1996, Chovan was convicted of inflicting corporal injury on a spouse, a misdemeanor, in violation of Cal. Penal Code § 273.5(a) in San Diego County Municipal Court.  [PSR 4; ER 44-46, 116; SER 8-15.][2/]  The conviction arose from an incident in which Chovan struck the victim, Cheryl Fix, in the face approximately 10 times after they got into a fight when they were both drinking.  At the time of Chovan's arrest, Fix's visible injuries included a contusion, cuts, which required sutures, bleeding, and an eye which was swollen shut.  Chovan claimed that Fix had struck him first, stated he only hit her once, and described the blow as a "lucky shot."  [SER 8-11.][3/]  By the time of his sentencing, more information about her injuries was available and it was learned that she had a fractured maxillary, and could not feel the right side of her face.  [SER 13.]  Ms. Fix also provided a letter to the court in which she stated that Chovan repeatedly called her home and harassed her while he was in custody, leaving her fearful for her life.  [SER 14.]

On October 31, 2009, Chovan attempted to purchase a firearm at Wholesale Guns, a gun dealer in Santee, California.  As is the regular course with the purchase of a firearm, Chovan completed ATF Form 4473 (Firearms Transaction Record).  Among other things, the form includes questions about an applicant's criminal history

---

[2/]    "PSR" refers to Presentence Report, which Appellant Chovan has already submitted to this Court.

[3/]    "SER" refers to Appellee United States' Supplemental Excerpts of the Record.

as relevant to federal restrictions on the possession of firearms by prohibited persons based on their criminal history. Question 11(i) of the form asks the applicant, "Have you ever been convicted in any court of a misdemeanor crime of domestic violence?" Chovan responded, "no" to the question, whereas he had previously sustained the 1996 conviction described above. [PSR 4; ER 116.] Chovan's application was denied based on his misdemeanor domestic violence conviction, and a copy of the notice of denial was mailed to Chovan at the address he provided on the ATF Form 4473 he completed. [PSR 1; SER 25-26.]

Subsequent to learning this information, agents learned from San Diego County Deputy Sheriff Crews that he responded to a call of a domestic abuse incident on March 29, 2010, at the home Chovan shared with his wife, Cheryl, located at 18582 Bee Canyon Road, Dulzura, California. Deputy Crews and his fellow deputies interviewed Cheryl and learned that Chovan had struck her with a cell phone. Cheryl also stated that she feared leaving her husband because he had previously threatened to hunt her down and shoot her if she ever left him. She further stated that she believed his threats because he had weapons inside the house, including a shotgun. [PSR 1.]

Thereafter, federal agents executed a search warrant at Chovan's home on April 15, 2010. The following guns and ammunition were seized during the search: a Winchester 12 gauge shotgun model 37A bearing serial number C974628 with 1 live round in the chamber; a Baldwin & Company limited 20 gauge shotgun; a Savage Arms Company .22 caliber Rifle; 3 rounds of Ammo Independence 12 gauge shells;

500 rounds of 22 cc/Speer caliber ammunition; 25 rounds of 12 gauge shotgun shells; and 3 loose rounds of ammunition. [PSR 1.]

Chovan was arrested the following day, and was interviewed after waiving his Miranda rights. He stated that the recovered firearms except for the handgun had all belonged to his grandfather, and that he used the guns for target practice and shooting rabbits. In addition, he also admitted to being associated with members of the National Socialist Movement ("NSM"), and that he had last shot guns with NSM members six or seven months prior to his arrest. Finally, he stated that he had been on a "border patrol" with NSM members in April 2009. [PSR 2; SER 19-23.]

On April 21, 2010, Cheryl signed a consent form authorizing the removal of a High Standard MPG .22 caliber handgun bearing serial number 2254942 from the home she shared with Chovan. [ER 27, 116.]

Agents also discovered videos of Chovan that had been posted on http://www.YouTube.com. The videos depict Chovan and other individuals firing both shouldered weapons and handguns in the vicinity of Chovan's residence. In one of the videos, Chovan is shown firing a shouldered weapon, while another one of the videos shows Chovan acting as a firearms instructor to an unidentified female in that he is seen teaching her to shoot a rifle. In addition, the videos include images of people gathered around an NSM flag, as well as images of people patrolling what appears to be the border between the United States and Mexico in an activity people described as a "border patrol." [SER 27.]

2.     Chovan's Motion to Dismiss Indictment

Chovan moved to dismiss the Indictment, arguing that his Second Amendment rights were violated, that he was not subject to prosecution under 18 U.S.C. § 922(g)(9) because his civil rights had been restored, and that his equal protection rights were violated in that certain felons could have their civil rights restored, whereas as a misdemeanant, he could not. The district court denied Chovan's motions, and issued a written order. [ER 98-107.]

3.     Guilty Plea and Sentencing

Chovan entered a conditional plea of guilty to count one of the Indictment, preserving his right to appeal the denial of his pre-trial motions, prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(9). [ER 113-125.] The district court sentenced him a sentence of 5 years' probation. [ER 162-64, 175.]

IV

SUMMARY OF ARGUMENT

Chovan argues that 18 U.S.C. § 922(g)(9) is an unlawful infringement on the Second Amendment rights of those with a misdemeanor crime of domestic violence conviction generally, as well as, as applied to him. In that 18 U.S.C. § 922(g)(9) is a presumptively lawful regulatory measure akin to the felon in possession of a firearm statute, 18 U.S.C. § 922(g)(1), it is outside of the individual Second Amendment right recognized in Heller v. District of Columbia, 128 S. Ct. 2783 (2008). That is, Chovan's conduct falls outside the Second Amendment in that the right to keep and bear arms was historically never understood to apply to people who engage in violent

or dangerous conduct. Therefore, he cannot invoke the Second Amendment's protection recognized in <u>Heller</u>. Even assuming that Chovan has rights under the Second Amendment, § 922(g)(9) withstands intermediate scrutiny, the applicable standard. Although the Second Amendment protects a fundamental right, the proper standard is not strict scrutiny. Instead, as every other court to consider that matter has concluded, intermediate scrutiny applies.

Contrary to Chovan's contention, the statute properly applies to Chovan, a domestic violence misdemeanant who attempts to inaccurately portray himself as a law abiding citizen.

Finally, Chovan's civil rights have not been restored such that he falls outside of the scope of those convicted of a misdemeanor domestic violence conviction, as defined in 18 U.S.C. § 921(a)(33)(B)(ii).

V

ARGUMENT

A.     18 U.S.C. § 922(g)(9) IS A "PRESUMPTIVELY LAWFUL
          REGULATORY MEASURE" AS SET FORTH IN HELLER

1.     Introduction

The Second Amendment right identified in <u>Heller</u> pertains to law-abiding citizens. 128 S. Ct. at 2821. Thus, the conduct that is proscribed by § 922(g)(9) falls outside of the Second Amendment. Instead, the statute is akin to § 922(g)(1) and is a "presumptively lawful regulatory measure." <u>Id</u>. at 2816-17 & n.26. Additionally, the statute survives the applicable standard, intermediate scrutiny.

7

2. <u>Standard of Review</u>

The constitutionality of a statute, as well as a constitutional challenge to the district court's denial of a motion to dismiss, is reviewed de novo. <u>United States v. Vongxay</u>, 594 F.3d 1111, 1114 (9th Cir. 2010).

3. <u>Merits</u>

a. <u>Background</u>

In <u>Heller</u>, the Supreme Court held that the Second Amendment provides an individual with a right to possess and use a firearm for lawful purposes, such as self-defense within the home. 128 S. Ct. at 2799, 2821-22. In so doing, the Court found that two District of Columbia statutes were unconstitutional to the extent that they completely banned handgun possession in the home and required all firearms within homes to be kept inoperable at all times, and thus unavailable for the lawful purpose of self-defense. <u>Id.</u> at 2822. Chovan has invoked <u>Heller</u>'s language and argues that he, a person who has been convicted of a misdemeanor crime of domestic violence, has the same protection under the Second Amendment as the plaintiff in <u>Heller</u>. Regardless of the reason for which Chovan possesses a firearm, his misdemeanor crime of domestic violence conviction means that he is not similarly situated to the petitioner in <u>Heller</u>, a special police officer in the District of Columbia who applied to register a handgun that he wished to keep in his home for self-defense and who had no criminal record. <u>Id.</u> at 2788. That is because the core of the Second Amendment right identified in <u>Heller</u> was that of "law-abiding, responsible citizens to use arms in the defense of hearth and home." <u>Id.</u> at 2821; <u>United States v. Chester</u>,

628 F.3d 673, 683 (4th Cir. 2010) (finding that the petitioner's right to possess a gun was not within the core Second Amendment right identified in <u>Heller</u> as a result of his misdemeanor domestic violence conviction).

However, despite the fact that Heller's rights were within the core Second Amendment right identified by the Supreme Court, the <u>Heller</u> court noted that "the right secured by the Second Amendment is not unlimited." <u>Heller</u>, 128 S. Ct. at 2816. In noting that limitations had historically existed in the right to bear arms, the Court did not make observations alone. Instead, it explicitly cautioned that restrictions on the right could be lawful and had existed for quite some time, observing that,

> nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms . . . we identify these presumptively lawful regulatory measures only as examples, not as an exhaustive list.

<u>Heller</u>, 128 S. Ct. at 2816-17 & n. 26.

In addition, in ordering the District of Columbia to allow the petitioner to register his handgun and obtain a license to carry the gun in his home, the Court specifically conditioned the order on the assumption that ". . . Heller is not disqualified from the exercise of Second Amendment rights . . ." <u>Heller</u>, 128 S. Ct. at 2822. In so doing, the Supreme Court emphasized that indeed, the rights conferred to individuals were not without limitations and more importantly, that there were individuals who could be lawfully disqualified from exercising the rights conferred by the Second Amendment.

b. Section 922(g)(9) Is Akin to § 922(g)(1), and This Court Can Apply the Same Analysis That the <u>Vongxay</u> Panel Applied to § 922(g)(1)

Section 922(g)(9) prohibits possession of firearms by those who have been convicted of a misdemeanor crime of domestic violence. When the section was enacted, it was done as an extension of § 922(g)(1) to close a "dangerous loophole and keep guns away from violent individuals who threaten their own families." 132 Cong. Rec. 22, 986 (Sept. 12, 1996) (statement of Sen. Lautenberg); <u>see</u> <u>United States v. Booker</u>, 644 F.3d 12, 25 n. 16 (1st Cir. 2011).

Since § 922(g)(9) precludes firearm possession by people who have been convicted of committing violent acts, it falls within the ambit of "presumptively lawful regulatory measures" as defined in <u>Heller</u>. <u>See</u> <u>Heller</u>, 128 S. Ct. at 2821. <u>Heller</u> explicitly cautioned that this list of exceptions to the Second Amendment consisted only of "examples" of "presumptively lawful" regulations, and warned lower courts not to view these examples as "exclusive." 128 S. Ct. at 2817 & n.26. Therefore, at the very least, lower courts are obligated to apply the same presumption to related statutes that are not logically distinguishable. <u>See</u> <u>Martin v. Franklin Capital Corp.</u>, 546 U.S. 132, 139 (2005) (noting the basic principle of justice that like cases should be decided alike).

The two statutes are related in that § 922(g)(9) dealt with the "thorny problem of domestic violence," which Congress recognized, "was not remedied by 'longstanding felon-in-possession laws.'" <u>United States v. White</u>, 593 F.3d 1199, 1206 (11th Cir. 2010). In addition, the background to § 922(g)(9)'s passage

10

demonstrates that § 922(g)(9) was passed, in part, as an extension of the prohibitions set forth in § 922(g)(1). For example, in adopting § 922(g)(9), Congress found that "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies," but "are, at most, convicted of a misdemeanor." 142 Cong. Rec. 22, 985 (1996) (statement of Sen. Lautenberg). In addition, the need and Congress' intent to remedy situations in which dangerous and violent offenders, whose victims happened to be related to them, were allowed to possess firearms has been recognized by the Supreme Court. United States v. Hayes, 129 S. Ct. 1079, 1087 (2009). The Hayes court also noted that "Firearms and domestic strife are a potentially deadly combination nationwide." Id. (citation omitted). Should this Court find that § 922(g)(9) is a presumptively lawful regulatory measure, it would not be alone in that at least one other circuit has agreed. See White, 593 F.3d at 1206; see also In re United States, 578 F.3d 1195, 1200 (10th Cir. 2009) (unpublished).

In addition, whereas § 922(g)(1) does not distinguish between those who have committed violent and non-violent felonies, § 922(g)(9) applies only to those who have been convicted of violent crimes against relatives and intimate partners. In this respect, it applies to a more targeted group of people than § 922(g)(1). This Court should thus extend the "presumption" of lawfulness that Heller conferred upon § 922(g)(1) to § 922(g)(9). See In re United States, 578 F.3d at 1200.

Last year, a panel of this Circuit addressed the effect of Heller on the constitutionality of the felon in possession of a firearm statute, 18 U.S.C. § 922(g)(1). Vongxay, 594 F.3d at 1114. The petitioner argued that Heller's discussion of statutes

11

that were "longstanding" and "presumptively lawful regulatory measures" was dicta, an argument that the panel summarily rejected. <u>Id.</u> at 1115. In so doing, the panel explained that the language served as a restriction on the ruling in <u>Heller</u>, and that "Courts often limit the scope of their holdings, and such limitations are integral to those holdings." <u>Id.</u> The panel therefore narrowly construed <u>Heller</u>, finding that its holding did not render § 922(g)(1) unconstitutional. <u>Id</u>; <u>see also</u> <u>United States v. Dugan</u>, No. 08-10579 2011 WL 4359902 at *1 (9th Cir. September 20, 2011) (finding that 18 U.S.C. § 922(g)(3), prohibiting the possession of firearms by unlawful users of or those addicted to a controlled substance, "embodies a longstanding prohibition of conduct similar to the examples mentioned in <u>Heller</u>" and "permissibly limits the individual right to possess weapons provided by the Second Amendment.")(citations omitted).

In addition to finding that <u>Heller</u> itself did not render § 922(g)(1) unconstitutional, the <u>Vongxay</u> court also found that it was still bound by circuit precedent which had found 18 U.S.C. § 922(g)(1) to be constitutional. <u>Id.</u> at 1116. (citing <u>In re Osborne</u>, 76 F.3d 306, 309 (9th Cir. 1996)) ("holding that [f]irst, a panel of this court may not overrule a decision of a previous panel; only a court in banc has such authority and [s]econd, the doctrine of stare decisis concerns the holdings of previous cases, not the rationales") (internal quotations omitted). The court acknowledged that circuit precedent in <u>United States v. Younger</u>, 398 F.3d 1179. 1192 (9th Cir. 2005) upholding § 922(g)(1) against a Second Amendment challenge, had been premised on the very notion rejected by the <u>Heller</u> court, that an individual right

to bear arms did not exist.  Id.  Nonetheless, in light of the circuit precedent requiring an en banc panel to reverse a three judge panel and the doctrine of stare decisis, the Vongxay court found that the legal inquiry as to whether 18 U.S.C. § 922(g)(1) was constitutional ended with its decision in Younger.  594 F.3d at 1116.

Similarly, circuit precedent finding that § 922(g)(9) does not unlawfully burden the Second Amendment exists.  United States v. Hancock, 231 F.3d 557, 565-66 (9th Cir. 2005).  In Hancock, the Court rejected the defendant's argument that § 922(g)(9) burdened his fundamental right to bear arms, which, as he argued, required the panel to apply strict scrutiny analysis to his equal protection claim.  Id. at 565.  The Hancock panel rejected the defendant's claim, again basing its analysis on the belief that no individual right to bear arms existed under the Second Amendment, the exact notion upon which the Younger court based its analysis.  Id. at 565-66; Younger, 398 F.3d at 1192.  Whereas the Younger defendant's claim was a claim that § 922(g)(1) was unconstitutional under the Second Amendment, and the Hancock defendant's claim was an equal protection claim, both panels found that the respective statutes in question did not burden the exercise of a fundamental right, albeit based on a notion rejected by the Heller court.  Id.  Nonetheless, the Vongxay court ended its legal inquiry with that circuit precedent.  This court evaluating Chovan's constitutionality claim should also adopt that approach, and find that Hancock's holding is still good law even after Heller.  In that, as discussed above, § 922(g)(9) was passed as an extension of § 922(g)(1), the two statutes are closely related and this court can also end its legal inquiry with Hancock's holding.

c. Congress' Power to Disarm Criminals Includes the
Power to Disarm Domestic Violence Misdemeanants

Even if the Court finds that it cannot rely on circuit precedent to find that § 922(g)(9) is constitutional, the Court can find that Congress has the power to disarm certain individuals, and that § 922(g)(9) is a presumptively lawful regulatory measure.

In Robertson v. Baldwin, 165 U.S. 275, 281 (1897), the Supreme Court declared it to be "perfectly well settled" that the Bill of Rights embodies "certain guaranties and immunities which we had inherited from our English ancestors," and "which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case." In addition, the Court also found that, "[i]n incorporating these principles into the fundamental law, there was not intention of disregarding these exceptions, which continued to be recognized as if they had been formally expressed." Ibid. This assertion has applicability in the instant case. While the Second Amendment did not explicitly address Congress' power to disarm criminals, the existence of such power was "understood." Id. at n. 34; see also Rutan v. Republic Party of Ill., 497 U.S. 62, 95-96 (1990) (Scalia, J., dissenting) ("The provisions of the Bill of Rights . . . did not create by implication novel individual rights overturning accepted political norms."). Accordingly, individuals who have been convicted of violent assaults on family members may forfeit their Second Amendment rights. Accord State v. Hirsch, 114 P. 3d 1104, 1136 (Or. 2005).

d.    Section 922(g)(9) Is Lawful Prohibition in That It Is a Presumptively Lawful Regulatory Measure

Chovan has argued that based on the text of the Second Amendment, a person's criminal history is not a basis for restricting his or her Second Amendment rights. While § 922(g)(1) in its current form was not enacted until 1968 and § 922(g)(9) was not enacted until 1996, evidence exists that restrictions on the right to bear arms have long existed. The fact that § 922(g)(9) restricts those who have committed violent acts from possessing firearms follows in a long line of prohibitions and restrictions on the right to possess firearms by people perceived as dangerous or violent. And for the reasons discussed below, Chovan's argument fails.

In Heller, the Supreme Court discussed the historical derivation of general limitations on Second Amendment rights, observing that the 1689 English Declaration of Rights, which declares "[T]hat the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law," was protected a right that was a precursor to the Second Amendment. 128 S. Ct. at 2798 (citing 1 W & M., c.2, § 7, in Eng. Stat. at Large 441 (1698)). And after engaging in a review of the historical right to bear arms, the Heller court noted that "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 2816.

In addition, historically, people who were restricted from bearing arms were people perceived as dangerous or not peaceful. Specifically, the Heller court noted that Catholics were frequently disarmed in that they were perceived as being

15

potentially disloyal, and thus a threat to the monarchy.  Id. at 2792.  Further, when the English Declaration of Rights was enacted, the 1662 Militia Act remained in effect.  The 1662 Militia Act gave the militia's lieutenants the authority to disarm "any person or persons" judged "dangerous to the Peace of the Kingdome."  13 & 14 Car. 2, c.3, § 1 (1662) (Eng.).  Despite the broad nature of this authority, the Act remained in effect and survived efforts to repeal it.  JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS, 23 (1994); accord Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should be Incorporated in McDonald v. City of Chicago*, 57 Clev. State L. Rev. 351, 373, 376, 382-83, 405 (2009).

In addition to the government's ability to keep arms away from people that it perceived as dangerous, authority also existed for the government to deprive individuals with convictions of their right to keep or use firearms.  For example, a Nottinghamshire labourer was bound "not to shoot again for seven years" after a misdemeanor conviction for "shooting with hailshot."  MALCOLM, *supra*, at 10.  In addition, people convicted of more serious crimes were required to forfeit all property, including presumably, their firearms.[4]  4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 95-97 (1769) (hereinafter "BLACKSTONE") (felonies "subject

_____

[4]      The forfeiture of property afflicted on felons in England was transported to the colonies and practiced "at least formally and fitfully," losing favor over time.  See George C. Thomas III, *Colonial Criminal Law and Procedure: The Royal Colony of New Jersey*, 1 N.Y.U. J. Of Law & Liberty, 671, 702 (2005).  The first Congress abolished automatic forfeiture of estate as a punishment for felons.  Act of April 30, 1790, ch. 9 s. 25, 1 Stat. 117.

the committers of them to forfeitures"), id. at 385; id. at 19 (counting 160 acts "to be felonies without benefit of clergy," i.e., "worth of instant death").

In the colonies, among those whose right to bear arms was most restricted were those who were thought to present the greatest risk to the colonial society, i.e., Native Americans, slaves, and freed men. MALCOLM, *supra*, at 140-41; Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment: Towards an Afro-Americanist Reconstruction*, 80 Georgetown L.J. 309, 323-27 (1991). In at least one colony, Virginia, the tradition of disarming the Catholics continued on the basis of allegiance. Robert Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: the Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007).

Colonial governments also disarmed people who refused to take an oath of loyalty. Saul Cornell, *Commonplace or Anachronism: the Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228-29 (1999); SAUL CORNELL, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 28-30 (2006). For example, in Pennsylvania, in 1776, the state constitution stated that "the people have a right to bear arms for the defense of themselves and the state." Pa. Const., Decl. of Rights, Art. XIII. Shortly thereafter, Pennsylvania passed a statute requiring citizens to take a loyalty oath. Those who refused to take the oath could be disarmed, thus giving the law the potential to disarm nearly forty percent of the population. Cornell, 16 Const. Comment at 228; see also

Churchill, 25 Law & History Rev. at 159 n.49 (describing a Connecticut statute disarming a person defaming the acts of Congress or the state assembly). According to historian Saul Cornell, this legislation is evidence that the right to bear arms was accepted as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner. Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 672 (2002).

Despite the citations discussed above which do in fact link the imposition of restrictions on Second Amendment rights to how law abiding or peaceful a person is, Chovan has cited to several other articles which state otherwise. And his point that domestic violence misdemeanants were not prohibited from possessing firearms prior to 1996 is well taken. However, the larger point is that there is historical support for restrictions being placed on the Second Amendment rights of those who had been convicted of crimes or were not thought to be peaceful. The Seventh Circuit has also adopted this view. United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010).

In Skoien, the Seventh Circuit found that the concept that there were limits on the Second Amendment stemmed from its origins, citing the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, a report that the Heller court had cited as a "precursor" to the Second Amendment. Id. (citing Heller, 128 S. Ct. at 2804). The Skoien court observed that "The report asserted that citizens have a personal right to bear arms unless for crimes committed, or real danger of public injury." Id. (internal quotations omitted). In

addition to Pennsylvania, in Massachusetts, an amendment was proposed at the Constitution's ratifying convention which sought to have the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States who are *peaceable citizens*, from keeping their own arms. 2 SCHWARTZ, THE BILL OF RIGHTS, A DOCUMENTARY HISTORY, 674-75, 681 (emphasis added).

Moreover, last year, a panel of this Circuit in Vongxay, while noting that the issue had not been completely resolved, cited the work of several Second Amendment scholars and found that a majority of them had opined that historically, the right to bear arms was one that was reserved for law abiding citizens, noting,

> that the right to bear arms was inextricably . . . tied to the concept of virtuous citizen[ry] that would protect society through defensive use of arms against criminals, oppressive officials, and foreign enemies alike, and that the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) . . .

594 F.3d at 1118 (internal quotations omitted).

Thus, based on the acknowledgment by this Circuit, other circuits, and the Supreme Court that evidence exists that the right to bear arms was not absolute, and was limited for those who had been shown not to be peaceable, the exclusion of Chovan and all persons convicted of misdemeanor crimes of domestic violence from the Second Amendment right is lawful.

B.    A REVIEW OF CHOVAN'S SECOND AMENDMENT CLAIM DEMONSTRATES THAT IT LACKS MERIT

Should this Court find that those convicted of misdemeanor crimes of domestic violence do have a right to bear arms under the Second Amendment, some standard of scrutiny review should be applied to determine whether the restriction imposed by

§ 922(g)(9) is constitutional.  Chovan has urged this Court to apply strict scrutiny review to § 922(g)(9).  Instead, for the reasons set forth below, intermediate scrutiny review should be applied.

1.  The Substantial Burden Analysis of <u>Nordyke</u> Does Not Apply to Chovan's Claim

In <u>Nordyke v. King</u>, the panel considered a regulation which prohibited the sale of firearms on county property.  644 F.3d 776,780 (9th Cir. 2011).  In determining how to analyze the regulation in question, the panel discussed why strict scrutiny analysis could not be applied to gun control regulations across the board because strict scrutiny analysis would require courts to estimate the effectiveness of each statute in reducing crime, an approach which the <u>Heller</u> court rejected.  <u>Id.</u> at 784.  Instead, the court determined that regulations which "substantially burden the right to keep and to bear arms" should be reviewed under heightened scrutiny.  <u>Id.</u> at 786.  That is, in determining whether the regulation in question substantially burdened Second Amendment rights, the <u>Nordyke</u> court found that it should determine whether the regulation allowed "*law abiding citizens* . . . reasonable alternative means for obtaining firearms for self-defense purposes." 644 F.3d at 787 (emphasis added).

Since Chovan has a violent criminal history and cannot be considered law abiding, he is not entitled to a determination under the reasonable alternative means analysis.  As discussed above, the Government believes that those convicted of misdemeanor crimes of domestic violence and subject to prosecution under § 922(g)(9) fall outside of the scope of the Second Amendment.  However, should this Court determine that Chovan (and all people who have been convicted of

misdemeanor crimes of domestic violence) do possess a Second Amendment right, then the Government concedes that § 922(g)(9) substantially burdens that right and standard of scrutiny review should be applied, specifically intermediate scrutiny, as discussed below.

> 2. Even Assuming That People Convicted of Misdemeanor Crimes of Domestic Violence Convictions Have Second Amendment Rights, Intermediate Scrutiny Should Be Applied

Chovan urges the Court to subject § 922(g)(9) to strict scrutiny analysis because it is a complete ban on the ability of domestic violence misdemeanants to possess a firearm. Because § 921(a)(33) allows for exceptions, he is wrong that it is a complete ban. 18 U.S.C. § 921(a)(33). He further argues that strict scrutiny should be applied because the Second Amendment governs a fundamental right. Strict scrutiny analysis of this claim is not appropriate in this case, as discussed below.

Chovan has argued that this Court should also apply strict scrutiny to his claim because the right conferred under the Second Amendment is fundamental in nature. However, that alone does not end the inquiry, as the Supreme Court has repeatedly applied intermediate scrutiny to other fundamental rights, including First Amendment claims. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989).

Application of strict scrutiny in this case would be inconsistent with the historical understanding of the right to keep and bear arms. As noted above, the restrictions on those who were allowed to keep and bear arms has a historical basis. In addition, an acknowledgment of the need to prevent criminals and other dangerous

people from possessing firearms also existed.  Further, in that the <u>Heller</u> court carved out exceptions and found that certain firearms regulations were "presumptively lawful" under the Second Amendment, it acknowledged that Congress had some deference to enact gun legislation.  <u>See</u> <u>Heller</u>, 128 S. Ct. at 2816-17 & n.26.  This deference does not comport with applying strict scrutiny analysis to this case.

The very nature of the Second Amendment right is also substantially different than, for example, the right to free speech.  While firearms serve lawful purposes, including the "core lawful purpose of self-defense," <u>Heller</u>, 128 S. Ct. at 2818, the exercise of the right to possess firearms can put others at risk of injury or death.  In regulating the possession of firearms, the government seeks to protect others and does not have a nefarious purpose, unlike other government actions that may trigger strict scrutiny, i.e., race based classifications.  Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007).  ("The reasons for strict scrutiny are familiar.  Racial classifications raise special fears that they are motivated by invidious purpose.").

Moreover, in addition to the Fourth Circuit, every other appellate court which has been faced with the question of applying strict scrutiny to a Second Amendment challenge to a § 922 prohibition has rejected applying strict scrutiny.  <u>See, e.g.,</u> <u>Booker</u>, 644 F.3d at 25; <u>Skoien</u>, 614 F.3d at 641-42; <u>United States v. Reese</u>, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to § 922(g)(8), prohibiting possession of a firearm by a person subject to a domestic violence protection order; <u>United States v. Marzzarella</u>, 614 F.3d 85, 96-97 (3d Cir. 2010) (applying

22

intermediate scrutiny to § 922(k), prohibiting possession of a firearm with an obliterated serial number, as well as finding that the statute would withstand strict scrutiny). For all of these reasons, the Court should find that strict scrutiny does not apply to this claim, and instead apply intermediate scrutiny to his claim.

Courts in other circuits have found that the Government must show that a "reasonable fit" exists "between the challenged regulation and a 'substantial' government objective" when applying intermediate scrutiny to § 922 statutes. See, e.g., Chester, 628 F.3d 673, 683; Marzzarella, 614 F.3d 85, 98. Chovan concedes that the Government has "a substantial interest in keeping firearms away from those most likely to use them." In addition, the Supreme Court has acknowledged that protection of the safety and lives of citizens is a compelling interest. United States v. Salerno, 481 U.S. 739, 754-55 (1987). In this Circuit, a panel of this Court has acknowledged the statute's purpose, stating that it is "to keep firearms out of the hands of people whose past violence in domestic relationships makes them untrustworthy custodians of deadly force." United States v. Belless, 338 F.3d 1063, 1067 (9th Cir. 2003); see also Hayes, 129 S. Ct. at 1087.

The question that remains is whether there is a reasonable fit between the statute and the substantial government interest. In arguing that no reasonable fit between the two exists, Chovan has cited to a First Amendment case in which the Supreme Court overturned a ban on all electrical utility promotional advertising where the stated purpose was to promote energy conservation. Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557 (1980). The analogy is wholly misplaced

in that it is readily apparent that banning promotional advertising would not serve the stated purpose where promotional advertising could actually include an energy conservation message.

However, in the § 922(g)(9) context, this is the only feasible way to keep people who have demonstrated violence in the past from being able to cause greater harm with a firearm than if they were unarmed. As discussed above, as evidenced by the legislative history, Congress enacted the statute because it sought to reach the people who had demonstrated violence, but were not kept from possessing firearms by § 922(g)(1) because domestic abusers are not often convicted of felonies. <u>Hayes</u>, 129 S. Ct. at 1087. Doing so is important for several reasons. First, a high rate of domestic violence recidivism exists. <u>See</u> <u>Skoien</u>, 614 F.3d at 643-44 (noting several studies on domestic violence recidivism estimate that the rate is between 35% and 80%); <u>Booker</u>, 644 F.3d at 26. Second, the incidence of violent crime between intimate partners is staggering. In particular, Congress acknowledged that the use of guns in incidents of domestic violence was a compelling concern. <u>See</u> <u>United States v. Smith</u>, 742 F. Supp. 2d 855, 867 (S.D.W.Va. 2010) (citing 142 Cong. Rec. 22, 986 ("finding that, annually, over 150,000 incidents of domestic violence involve a gun"). In addition, as the First Circuit recently noted, "[N]early 52,000 individuals were murdered by a domestic intimate between 1976 and 1996, and the perpetrator used a firearm in roughly 65% of the murders (33,500)." <u>Booker</u>, 644 F.3d at 26. Moreover, incidents of domestic violence involving firearms are twelve times more likely to end in the victim's death than incidents where a perpetrator is either unarmed or armed

with a knife alone. Skoien, 614 F.3d at 643 (citing Linda E. Saltzman, James A. Mercy, Patrick W. O'Carroll, Mark L. Rosenberg & Philip H. Rhodes, *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 J. Am. Medical Ass'n 3043 (1992)).

Despite the facts above, Chovan argues that § 922(g)(9)'s application is far too broad. He is wrong. Given the government's substantial interest and the statistics cited above, there is a reasonable fit between the stated interest in keeping firearms out of the hands who have demonstrated a history of a violence and the statute. In addition, although the statute may have a broad impact, thereby affecting people who have not shown any recidivism, this is an acceptable ancillary consequence of the statute. As discussed in Skoien, "[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limited be established by evidence presented in court." 614 F.3d at 641.

Finally, Chovan also argues that this Court should at the very least remand this case so that the Government can set forth sufficient facts which would demonstrate that a reasonable fit exists between the statute and the stated purpose. It is correct that the district court denied Chovan's motions to dismiss the Indictment without reaching the question of what level of scrutiny to apply. However, that was appropriate in light of the circuit precedent in Vongxay. That is, just as the panel did in Vongxay, the district court found the statute to be constitutional based upon circuit precedent and the "presumptively lawful regulatory measure" analysis which did not require the

district court to reach the question of what level of scrutiny applied. Remanding the case for the Government to provide additional relevant statistical information would contradict the path of the case law as developed in this Circuit. See Vongxay, 594 F.3d at 1114-16. In addition, as set forth herein, the statistics on the relationship between recidivism and domestic violence, as well as the high incidence of murders committed by intimate partners when they are armed, are clear. As such, this Court can review the empirical data submitted in this brief and analyze the relationship between the substantial interest and the statute without remanding this matter.

In that there is a reasonable fit between the stated purpose and the statute, this Court should find that the statute survives intermediate scrutiny. Doing so would also be consistent with Heller's "presumptively lawful regulatory measure" rationale because in that a reasonable fit exists, the statute is akin to the limitations that the Heller court took care to highlight as exceptions to its holding. Heller, 128 S. Ct. at 2816-17 & n.26; Vongxay, 594 F.3d at 1115.

### C.  CHOVAN'S CHALLENGE TO THE CONSTITUTIONALITY OF THE STATUTE AS APPLIED TO HIM MUST ALSO FAIL

#### 1.  Introduction

Chovan claims that the statute cannot survive strict nor intermediate scrutiny when reviewed in light of his claim that the statute is unconstitutional as applied to him. Because Chovan cannot distinguish himself from other people convicted of misdemeanor domestic violence convictions, his claim must fail.

2.     <u>Standard of Review</u>

The constitutionality of a statute, as well as a constitutional challenge to the district court's denial of a motion to dismiss, is reviewed de novo. <u>Vongxay</u>, 594 F.3d at 1114.

3.     <u>Merits</u>

a.     <u>Strict Scrutiny Does Not Apply to Chovan's as Applied Challenge</u>

As discussed above, even when applied to his specific claim, strict scrutiny does not apply because § 922(g)(9) is a "presumptively lawful regulatory measure" as identified in <u>Heller</u>. <u>Heller</u>, 128 S. Ct. at 2816-2817 & n.26; <u>Vongxay</u>, 594 F.3d at 1115.

b.     <u>The Statute Survives Intermediate Scrutiny, and in Any Event, He Cannot Distinguish Himself From His Fellow Domestic Violence Misdemeanants</u>

Turning to intermediate scrutiny analysis of his as applied challenge, as discussed above, Chovan concedes that a substantial government interest exists, a point echoed in <u>Belless</u>. 338 F.3d at 1067. Chovan only argues that there is not a reasonable fit between the statute and the substantial government interest.

Chovan argues that the statute is unconstitutional as applied to him in that his conviction is old and he has been otherwise law abiding since that conviction. In addition, he argues that he himself has not been a domestic violence recidivist. In making that claim, Chovan ignores several things. First, and perhaps most importantly, he ignores the fact that the search warrant which led to the recovery of the shotgun, rifle, and handgun recovered from his home was based in part on

information provided by the San Diego County Sheriff's Department after responding to a domestic abuse call at Chovan's home on March 29, 2010. [PSR 1.] At Chovan's home, a Deputy Sherriff spoke with Cheryl Chovan, the same woman who was the victim in the incident which lead to Chovan's 1996 conviction. [PSR 1, 4; ER 44-46, 116.] Specifically, she stated that her husband, Chovan, had threatened to hunt her down and shoot her if she ever left him, and that she believed his threats because he had weapons inside the house. [PSR 1.] To be clear, a woman who in 1996, Chovan struck so severely that he fractured her jaw, leaving her without feeling on the right side of her face, sought law enforcement help because she had been threatened by Chovan and was afraid that he was capable of actually hurting her because he had access to firearms. [ER 46.] Chovan is in fact just the kind of person that Congress sought to prohibit from possessing guns, and rightfully so in that he had the motive and means to cause the harm to his significant other that he threatened to harm. Chovan argues that the report by his wife to the Sheriff's Department should not be given weight in that he was not arrested for the incident, but his questioning why he was not arrested is nothing more than speculation. In addition, unfortunately, not all domestic violence leads to arrest. See Skoien, 614 F.3d at 644 (discussing the high incidence of domestic violence recidivism and noting that the rates include incidents of violence that do not lead to arrest).

In addition to incidents of domestic violence, Chovan has not demonstrated that he has been otherwise law-abiding. Instead, evidence exists that he provided a false statement on ATF form 4473 in October 2009 about the existence of his misdemeanor

domestic violence conviction. [PSR 4; ER 116.] He was also caught shoplifting with his girlfriend while he was out on bond while awaiting sentencing in this case. [SER 3, 17.] In addition, despite his argument that his participation in the NSM is irrelevant, it is relevant to his claim that he is a person who seeks to possess a firearm for self-defense purposes in his home. As demonstrated by the videos provided to the district court depicting Chovan and other members of the NSM, the videos show images of Chovan and others firing guns interspersed with images of NSM members on patrols along what appears to be the United States-Mexico border. [SER 27.] Chovan himself admitted to agents that he had shot guns with NSM members approximately six to seven months before his April 2010 arrest, as well as that he had been on a "border patrol" with NSM members in April 2009. [PSR 2; SER 19-23.] That means that he went on a "border patrol" with NSM members within six months and shot guns with NSM members within a month or so of his October 2009 attempt to acquire a new gun by providing false information. All of this information undermines his attempt to distinguish himself from other people convicted of domestic violence misdemeanors, as well as his claim that his stated purpose in possessing a firearm is for self-defense in his home.

Based on Chovan's inability to distinguish himself from the class of people from whom Congress sought to keep firearms away, the discussion above about the reasonable fit between the government's substantial interest and the statute, applies to Chovan's as applied challenge. And for the reasons stated above, the statute survives intermediate scrutiny and Chovan's claim fails.

### D. CHOVAN IS PROPERLY SUBJECT TO PROSECUTION UNDER THE STATUTE

#### 1. Introduction

Chovan has argued that he is disqualified from being charged with a violation of § 922(g)(9) because his civil rights have been restored within the meaning of § 921(a)(33)(B)(ii).  For the reasons set forth below, he is in error and his motion should be denied.

#### 2. Standard of Review

The constitutionality of a statute, as well as a constitutional challenge to the district court's denial of a motion to dismiss, is reviewed de novo.  Vongxay, 594 F.3d at 1114.

#### 3. Merits

##### a. Chovan's Civil Rights Were Never Restored

In Logan v. United States, the Supreme Court addressed the meaning of a defendant having his or her "civil rights restored" as described in 18 U.S.C. § 921(a)(20), a provision that tracks 18 U.S.C. § 921(a)(33)(B)(ii) as to the issue of restoration of rights.  552 U.S. 23, 36 (2007).  The Supreme Court noted that in § 921(a)(33)(B)(ii), "the words 'civil rights restored' do not a cover a person whose civil rights were never taken away." Id.

A panel of this Circuit has noted that "no civil right could be more relevant to a felon's future dangerousness than the right to possess firearms."  United States v. Valerio, 441 F.3d 837, 843.  In Valerio, the court addressed a conviction for felon in possession in light of the provision in 18 U.S.C. § 921(a)(20).  In that case, the issue

was whether the defendant had been convicted of a felony for purposes of a conviction under 18 U.S.C. § 922(g)(1) where the defendant had initially received a deferred imposition of sentence and subsequent discharge under New Mexico state law. Id. at 839. The Valerio court found that even though the defendant's civil rights, including the right to vote and to possess firearms, had been restored by the state of New Mexico, the restoration of those civil rights were insufficient to place him within the category of individuals who were precluded from prosecution by § 921(a)(20). Id. at 843-44. In support of its holding, the court cited the Supreme Court's words in Caron that "existing state law 'provide less than positive assurance that the person in question no longer poses an unreasonable risk of dangerousness'" and further opined that "Congress meant to keep guns away from all offenders who, the Federal Government feared, might cause harm, even if those persons were not deemed dangerous by the state." Id. at 843.

In Chovan's case, he was convicted of a misdemeanor violation of Cal. Penal Code § 273.5. [PSR 4; ER 44-46, 116.] As a consequence of this conviction, Chovan lost his ability to possess firearms under state law for a 10 year period. Cal. Pen. Code § 12021(c)(1). Specifically, the statute precludes a defendant who has been convicted of misdemeanor violations of § 273.5 from owning, purchasing, receiving, or possessing a firearm for a 10 year period after the conviction, and the violation of the statute is a misdemeanor violation punishable by a year in jail. Id. Other than the restriction set forth in § 12021, Chovan has not cited to any other restrictions that were placed on him in relation to his conviction for a misdemeanor crime of domestic

violence. That is because indeed, there are no others. Despite his conviction, he retained his right to vote, hold public office, and be a juror. Cal. Const. art II, § 4; Cal. Const. art VII, § 8; Cal. Penal Code § 893(a)(3). In addition, when he regained his ability to possess a firearm under California state law, it was done by operation of law.[5] That is, as discussed in § 12021, the restriction on his possession was in effect for a 10 year period which ceased at the end of the 10 year period. See Cal. Penal Code § 12021(c)(1). Based on the Supreme Court's reasoning in Logan, Chovan is erroneous in arguing that the restoration of his civil rights is complete and that he falls within the group of people whose civil rights were restored within the meaning of § 921(a)(33)(B)(ii). In fact, the only civil right of his that was restored was the ability to possess a firearm lawfully under California state law alone. In addition, based on the decision in Valerio, the restoration of this right alone by operation of law is insufficient to protect Chovan from prosecution for a violation of § 922(g)(9).

Chovan argues that a finding that his civil rights were not restored such that he is not excluded from prosecution creates an equal protection problem because he is being treated differently in that people convicted of similar or even more serious offenses, in states that actually allow for the restoration of rights, would not be prosecuted under § 922(g)(9). The defendant in Hancock raised the same equal

---

[5] This is significant in that in the case of a defendant who had received a piece of paper referred to as a "discharge order" which purported to restore his civil rights, the Ninth Circuit found that a prosecution under § 922(g)(1) was precluded by § 921(a)(20) because the defendant had been affirmatively informed that all of his civil rights had been restored and thus "a reservation in a corner of the state's penal code can not be the basis of a federal prosecution." United States v. Laskie, 511 F.3d 894, 900-901 (9th Cir. 2001).

protection claim in a pre-<u>Heller</u> case. 231 F.3d at 566-67. The <u>Hancock</u> panel agreed with the Eighth Circuit's conclusions that "the discrepancy in treatment of which the defendant complained was the inevitable result of Congress' reference to state law" and the statute did not violate equal protection rights because domestic violence misdemeanants could regain their right to possess a firearm based upon means set forth in § 921(a)(33)(B)(ii). <u>Id.</u> at 567 (citing <u>United States v. Smith</u>, 171 F.3d 617, 626 (8th Cir.1999)). Based on this prior precedent which has not been overruled, the Chovan's claim must fail. <u>See</u> <u>Vongxay</u>, 594 F.3d at 1119 (citing <u>State Oil Co. v. Khan</u>, 52 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."); <u>see also</u> <u>Skoien</u>, 614 F.3d at 644-45 (finding that even though different outcomes may occur based upon the state in which a person is convicted, that this is acceptable because the statute depends on state law).

Because Chovan's civil rights were not restored, and circuit precedent precludes his equal protection argument, Chovan's claim must be denied.

# VI

## CONCLUSION

For the forgoing reasons, Chovan's conviction should be affirmed.

Dated: September 21, 2011.

Respectfully submitted,

LAURA E. DUFFY
United States Attorney

BRUCE R. CASTETTER
Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division

s/Caroline P. Han

CAROLINE P. HAN
Assistant U.S. Attorney

Attorneys for Plaintiff-Appellee
United States of America

C.A. No. 11-50107

<u>STATEMENT OF RELATED CASES</u>

Counsel for the United States is not aware of any related cases.

C.A. No. 11-50107

CERTIFICATE OF COMPLIANCE

I certify that:

Pursuant to Fed. R. App. P. 32(a)(7)(c) and 9th Cir. R. 32-1, the attached opening/answering/reply/cross-appeal brief is:

 X    Proportionately spaced, has a typeface of 14 points or more and contains 8887 words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words), or is:

 ___    Monospaced, has 10.5 or fewer characters per inch and contains ____ words or ___ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

Date: September 21, 2011.

s/Caroline P. Han<br>CAROLINE P. HAN<br>Assistant U.S. Attorney